# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DINA NICOLE D'ANTUONO,      :
RAMONA P. CRUZ, KAREN      :
VILNIT,      :
        :
     Plaintiffs,      :
        :
v.      :     No. 3:11cv33 (MRK)
        :
SERVICE ROAD CORP.; COUSIN      :
VINNIE'S BACK ROOM, INC.,      :
        :
     Defendants.      :

## AMENDED MEMORANDUM OF DECISION[1]

Arbitration is currently one of the most important issues in the federal courts. During October Term 2009, the United States Supreme Court decided a total of ninety-two merits cases, *see Final Stats OT09*, SCOTUSblog.com, http://www.scotusblog.com/wpcontent/uploads/2010/07/Final-Stats-OT09-0707101.pdf (July 17, 2010), and four of the ninety-two merits cases presented arbitration-related questions. *See Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S. Ct. 2847, 2853 (2010); *Rent-A-Center West, Inc. v. Jackson*, 130 S. Ct. 2772, 2775 (2010); *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S. Ct. 1758, 1764 (2010); *Union Pacific Railroad Co. v. Brotherhood of Locomotive Engineers*, 130 S. Ct. 584, 591 (2009). Three of those four cases presented issues specifically related to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq. See Granite Rock*, 130 S. Ct. at 2857; *Rent-A-Center*, 130 S. Ct. at 2775; *Stolt-Nielsen*, 130 S. Ct. at 1764. The United States Supreme Court decided yet another FAA case this past April, *see AT&T Mobility LLC v. Concepcion*, 131 S. Ct.

---

[1] The purpose of this Amended Memorandum of Decision is to add language certifying an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), following the Court's Ruling and Order [doc. # 62] granting Plaintiff's Motion to Certify Order for Interlocutory Appeal [doc. # 58].

1740, 1744 (2011), and it will hear at least two more FAA cases during its next Term. *See CompuCredit Corp. v. Greenwood*, --- S. Ct. ----, 2011 WL 220683, at *1 (2011) (granting petition for certiorari); *Stok & Associates, PA v. Citibank, NA*, 131 S. Ct. 1556, 1556 (2011) (granting petition for certiorari).

The case pending before this Court presents difficult questions regarding the formation and enforceability of an arbitration agreement in a unique factual context. According to Plaintiffs, Defendants Service Road Corp. ("Service Road") and Cousin Vinnie's Back Room, Inc. ("Cousin Vinnie's") own and operate the Gold Club and the Gold Club Connection – together, "the Clubs" – in Groton, Connecticut.[2] The Gold Club is a bar that features topless female dancers as entertainment; the Gold Club Connection is an nightclub that features fully nude female dancers as entertainment. Plaintiffs Dina Nicole D'Antuono, Ramona P. Cruz, and Karen Vilnit are exotic dancers who have performed at the Clubs – the Court uses the phrase exotic dancers throughout this Memorandum of Decision because that is the phrase that Plaintiffs use to describe their occupation in the Complaint. *See* Compl. [doc. # 1] ¶ 1. When they performed at the Clubs, Plaintiffs were classified as tenants who rented performance space from the Clubs. *See* Tab 1 to First Genna Decl. [doc. # 13-1] at 5. They allege that they were really the Clubs' employees, and they seek both unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and other damages under Connecticut employment laws.

_____

[2] In their memorandum in support of the pending motion, Defendants point out that Plaintiffs have sued the wrong defendants, in that Service Road and Cousin Vinnie's own and operate the Clubs' Hartford locations, not the Clubs' Groton locations. *See* Mem. in Supp. [doc. # 13] at 1 n.1. Two different companies controlled by the same individuals, C & G of Groton, Inc. and RCG of Groton, Inc., actually own the Clubs' Groton locations. *See id.* But Defendants do not argue that Plaintiffs' mistake requires dismissal of this case. Plaintiffs may amend their Complaint to name the correct Defendants. *See* Fed. R. Civ. P. 15 (a)(2) ("The court should freely give leave [to amend] when justice so requires.").

Service Road and Vinnie's have filed a Motion to Dismiss and/or Stay this Action; to Compel Arbitration; and to Strike Class and Collective Action Allegations [doc. # 12] from Plaintiffs' Complaint [doc. # 1]. For the reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART. The Court DENIES Defendants' motion insofar as it seeks an order to compel Ms. Cruz to arbitrate her claims against Defendants, since there is nothing in the record before the Court to show that she even implicitly agreed to arbitration. However, the Court GRANTS Defendants' motion insofar as it seeks an order to compel Ms. D'Antuono and Ms. Vilnit to arbitrate their claims against Defendants, and on an individual basis rather than on a collective or class basis. Ms. D'Antuono and Ms. Vilnit undisputedly agreed to arbitration. In light of Defendants' concession that they will not seek to enforce the two most objectionable provisions in the arbitration agreement, *see* Notice [doc. # 52], the Court concludes that there is no ground under either Connecticut law or under the federal common law of arbitrability that permits the Court to invalidate Ms. D'Antuono's or Ms. Vilnit's agreement, including the provision requiring them to arbitrate their claims on an individual basis. As a result of the Court's decision, Plaintiffs' Motion for Clarification [doc. # 53] is also DENIED as moot.

**I.**

The Court sets forth only those facts that are necessary for purposes of resolving the pending motion. According to Plaintiffs' Complaint as well as various declarations filed in opposition to the pending motion, Ms. D'Antuono performed at the Clubs from December 2007 until February 2010, *see* D'Antuono Decl. [doc. # 26-2] ¶ 1; Ms. Cruz performed at the Clubs from August 2008 until December 2008, *see* Cruz Decl. [doc. # 26-4] ¶ 1; and Ms. Vilnit performed at the Clubs from December 2007 until November 2009, *see* Vilnit Decl. [doc. # 26-3] ¶ 1. Defendants assert in support of the pending motion that it is their "normal business practice

to have [every exotic dancer] execute a . . . Lease" setting forth the terms of the relationship between the exotic dancer and the Clubs. First Genna Decl. [doc. # 13-1] ¶ 6. Defendants further claim that it is their policy to always "explain to the [exotic dancer] that [the Lease] . . . governs the relationship between [the exotic dancer] and the [C]lubs." Bergeron Decl. [doc. # 38-1] ¶ 4.

Ms. D'Antuono, who began performing at the Clubs in December 2007, signed an "Entertainment Lease" ("Lease") on November 4, 2008. Tab 1 to First Genna Decl. [doc. # 13-1] at 5, 8. However, according to Ms. D'Antuono's declaration, November 4, 2008 was the first day that anyone at the Clubs ever asked her to sign a Lease. *See* D'Antuono Decl. [doc. # 26-2] ¶ 5. On that date, during the middle of Ms. D'Antuono's performance shift, manager Miranda Bergeron asked Ms. D'Antuono to accompany her to the Clubs' office to update her paperwork. *See id.* Ms. Bergeron told Ms. D'Antuono that the Lease stated that Ms. D'Antuono was a subcontractor of the Clubs and worked for herself. *See id.* ¶ 6. Ms. D'Antuono signed the Lease and left the office to continue performing within five minutes after she arrived. *See id.* ¶ 8.

Ms. Vilnit, who also began performing at the Clubs in December 2007, signed the same form Lease on September 17, 2008, about two months before Ms. D'Antuono. *See* Tab 1 to First Genna Decl. [doc. # 13-1] at 10, 13. According to Ms. Vilnit, September 17, 2008 was the first day that anyone at the Clubs ever asked her to sign a Lease. *See* Vilnit Decl. [doc. # 26-3] ¶¶ 4-7. On that date, during the middle of Ms. Vilnit's performance shift, Ms. Bergeron asked Ms. Vilnit to accompany her to the Clubs' office to complete tax-related paperwork. *See id.* ¶¶ 4-5. Ms. Bergeron presented Ms. Vilnit with the Lease, and Ms. Vilnit signed it quickly and left the office to continue performing within five minutes after she arrived. *See id.* ¶ 7.

Ms. Cruz, who began performing at the Clubs in August 2008, never signed a Lease. According to Ms. Cruz, she showed up at one of the Clubs and was allowed to start performing

the very same day. *See* Cruz Decl. [doc. # 26-4] ¶ 3. All that she was required to do was to show her identification, and fill out a form asking for her legal name, her stage name, and her home address. No one – not Ms. Bergeron or anyone else – ever asked her to sign the Lease or any other contract. *See id.* ¶¶ 2-3.

Defendants contend that Ms. Cruz never actually performed at the Clubs, and point out that she is named as a plaintiff in several similar cases pending before other courts, some involving the same plaintiffs' lawyers. *See* Bergeron Decl. [doc. # 38-1] ¶ 10 (asserting that no one at the Clubs remembers Ms. Cruz). To the extent that there is a dispute about whether Ms. Cruz actually performed at the Clubs, that dispute is not related to the pending motion, but instead goes to the merits of this case. For the time being, the Court need not consider whether she actually performed at the Clubs for a brief period at the end of 2008, as she alleges.

Defendants have not provided the Court with any admissible materials that contradict Ms. D'Antuono's and Ms. Vilnit's accounts of the circumstances under which they signed the Lease. Ms. Bergeron recalls presenting copies of the Lease to Ms. D'Antuono and Ms. Vilnit, and while she insists that it was not her intention to present the Lease in a "rushed or coercive manner," she does not contest that both signed the Lease within five minutes after she first showed it to them. Bergeron Decl. [doc. # 38-1] ¶¶ 5-7. Paul Genna, an officer of Service Road and Cousin Vinnie's, recalls that he received a telephone call from one of his managers asking if Ms. Vilnit could have permission to take a copy of the Lease home before she signed it, so that she could have an attorney review it. *See* Second Genna Decl. [doc. # 38-2] ¶ 4. Mr. Genna recalls that he told the manager that Ms. Vilnit could indeed take the Lease home if she wished, but does not recall whether Ms. Vilnet actually took the Lease home. *See id.* Mr. Genna's recollection is not inconsistent with Ms. Bergeron's or Ms. Vilnit's declaration. *See* Vilnit Decl. [doc. # 26-3] ¶ 7.

Neither Ms. Bergeron nor Mr. Genna contests that Ms. D'Antuono and Ms. Vilnit were first shown the Lease and were first asked to sign the Lease nearly after a year after they first began performing at the Clubs. Mr. Genna baldly asserts that the Clubs had a policy of not permitting any exotic dancer to perform unless she first agreed to the terms of the Lease. *See* First Genna Decl. [doc. # 13-1] ¶ 6. But Defendants have not introduced any materials to show how the Clubs went about obtaining exotic dancers' consent to the terms of the Lease. There is no evidence that, for example, a copy of the Lease was posted in the exotic dancers' dressing room, or that the text of the Lease was included in any handbook or other document that was provided to new exotic dancers when they first arrived at the Clubs. Thus, Defendants' assertion that their "normal business practice" was to have all exotic dancers sign copies of the Lease, First Genna Decl. [doc. # 13-1] ¶ 6, is not consistent with any of the specific factual assertions made by either Plaintiffs or Defendants. The only concrete factual allegations before the Court show that the Clubs allowed at least two exotic dancers to perform for a year before showing them a copy of the Lease or asking them to sign a copy of the Lease, and that one exotic dancer who performed at the Clubs for several months never signed the Lease.

The four-page form Lease – which Ms. D'Antuono admittedly signed on November 4, 2008 and which Ms. Vilnet also admittedly signed on September 17, 2008 – indicates that the agreement between the exotic dancer and the Clubs is to take effect on the date the Lease is signed. *See* Tab 1 to First Genna Decl. [doc. # 13-1] at 5.[3] It indicates that the agreement is to end at the latest one year from the date when the Lease is signed. *See id*. The Lease specifies that

_____

[3] As the Court pointed out at oral argument, Ms. D'Antuono and Ms. Vilnet could have argued that the Lease does not preclude them from suing Defendants in federal court for violations of federal or state labor laws that occurred *before* Ms. D'Antuono and Ms. Vilnet signed the Lease and after the Lease ended. But that argument was nowhere to be found in Ms. D'Antuono's and Ms. Vilnet's briefing. Furthermore, their counsel made no attempt whatsoever to press that argument even when the Court suggested it to her at oral argument.

it creates a landlord-tenant relationship, rather than an employment relationship: the exotic dancer will rent the stage and other performance spaces in the Clubs, and may collect tips and payments directly from the Clubs' customers. *See id.* The Lease specifies that the Clubs will not pay the exotic dancer any hourly wage, any overtime pay, or any benefits. *See id.* The Lease specifies that if the exotic dancer were an employee rather than a tenant, then the customer fees would be the Clubs' property rather than the exotic dancer's own property. *See id.* It further indicates that "if any court, tribunal, arbitrator, or governmental agency determines that the relationship between the parties is something other than that of landlord/tenant and that [the exotic dancer] is . . . entitled to the payment of wages from the Club[s]," the exotic dancer must pay back customer fees to the Clubs. *See id* at 5-6.

The Lease also contains an arbitration clause on the last page. *See id.* at 8. Most of the arbitration clause is either in boldface type, in capital letters, or underlined – sometimes all three. *See id.* The Court reproduces the arbitration clause in its entirety below:

> **21. Arbitration/Attorney Fees and Costs/Waiver of Class Action.** ANY CONTROVERSY, DISPUTE, OR CLAIM ARISING OUT OF THIS **LEASE** OR OTHERWISE OUT OF **ENTERTAINER** PERFORMING AT THE **PREMISES OF THE CLUB**, SHALL BE EXCLUSIVELY DECIDED BY BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT, IN CONFORMITY WITH RULES AND PROCEDURES AS ESTABLISHED BY THE AMERICAN ARBITRATION ASSOCIATION AND AS MAY BE MODIFIED BY ANY STATE ARBITRATION ACT. Any judgment or award may be entered in any court having jurisdiction thereof.
>
> Any judgment, order, or ruling arising out of a dispute between the parties shall award costs incurred for the proceedings and reasonable attorney fees to the prevailing party.
>
> **ENTERTAINER** AGREES THAT ALL CLAIMS BETWEEN HER AND THE **CLUB** WILL BE LITIGATED INDIVIDUALLY AND THAT SHE WILL NOT CONSOLIDATE OR SEEK CLASS TREATMENT FOR A CLAIM. **ENTERTAINER** FURTHER AGREES NOT TO COMMENCE ANY ACTION, SUIT OR ARBITRATION PROCEEDING RELATING, IN ANY MANNER WHATSOEVER, TO THIS **LEASE** OR TO HER PERFORMING AT THE

<u>**PREMISES** OF THE CLUB, MORE THAN SIX MONTHS AFTER SHE LAST PERFORMED AT THE **PREMISES**, AND FURTHER AGREES TO WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY.</u>

This paragraph 21 survives termination of this Lease.

*Id.* The blank spaces provided for the exotic dancer's signature and for the signature of the Clubs' representative appear only a few lines below the arbitration clause. *See id.*

The Lease also contains a comprehensive severability clause on the final page. The Court the severability clause in its entirety below:

> **20. <u>Severability</u>.** In the event that any term, paragraph, subparagraph, or portion of this **Lease** is declared to be illegal or unenforceable, this **Lease** shall, to the extent possible, be interpreted as if that provision was not a part of this **Lease**; it being the intent of the parties that any illegal or unenforceable portion of this **Lease**, to the extent possible, be severable from this **Lease** as a whole. However, in the circumstance of a judicial, arbitration, or administrative determination that the business relationship between **Entertainer** and the **Club** is something other that that of landlord and tenand, **Entertainer** and the Club shall be governed by the provisions of subparagraph 12C.

*Id.* As the severability clause is also on the last page of the Lease, the blank spaces provided for the exotic dancer's signature and for the signature of the Clubs' representative appear only a few lines below the severability clause. *See id.*

Plaintiffs filed their Complaint in this Court on January 6, 2011. Their primary allegation, as the Court has already mentioned, is that they were employees rather than tenants or independent contractors when they performed at the Clubs, and were therefore owed the minimum wage. *See* Compl. [doc. # 1] ¶ 14. They also appear to believe that the provision of the Lease that requires them to repay the fees they received from the Clubs customers if a court finds them to have been employees of the Clubs violates Connecticut law. *See* Mem. in Opp'n [doc. # 26] at 28. However, that particular issue is not specifically raised in the Complaint.[4]

---

[4] The Complaint also repeatedly indicates that the Lease misclassified Plaintiffs as independent

Defendants filed the pending Motion to Dismiss and/or Stay this Action; to Compel Arbitration; and to Strike Class and Collective Action Allegations on January 28, 2011. After the motion was filed, the Second Circuit issued its decision in *In re American Express Merchants' Litigation* ("*American Express II*"), 634 F.3d 187 (2d Cir. 2011). In light of that decision, the Court directed Defendants to specifically address that decision in their reply brief and permitted Plaintiffs to file a sur-reply. *See* Order [doc. # 29]. The week before oral argument, the United States Supreme Court issued its decision in *AT&T Mobility*, 131 S. Ct. at 1740. In advance of oral argument, the Court ordered both parties to be prepared to discuss the possible impact of that decision on this case. *See* Order [doc. # 47].

At oral argument, the Court attempted to clarify Defendants' position regarding whether they planned to enforce two of the three features of the arbitration clause Plaintiffs take issue with: the cost- and fee-shifting provision, and the provision requiring that all arbitration claims be brought no later than six months after a dancer's final performance at the Clubs. *See* Tab 1 to First Genna Decl. [doc. # 13-1] at 8. The Court did not get a clear answer from Defendants' counsel at oral argument. The Court therefore issued an Order [doc. # 50] directing Defendants to give the Court a yes or no answer regarding whether it intended to enforce those two provisions in an arbitration. On May 23, 2011, Defendants filed a Notice [doc. # 52] in which they unequivocally concede that they will not enforce those two provisions against Plaintiffs.

## II.

At the outset, the Court must consider the issue of subject-matter jurisdiction. Defendants argued in passing in their memorandum in support of the pending motion that because Ms. D'Antuono, Ms. Cruz, and Ms. Vilnit have agreed to arbitrate any disputes with Defendants, this

---

contractors. *See* Compl. [doc. # 1] ¶ 1. It says nothing about the fact that Plaintiffs were actually considered tenants according to the terms of the Lease, not independent contractors.

Court lacks subject-matter jurisdiction over the federal law and state law claims in Plaintiffs' Complaint. *See* Mem. in Supp. [doc. # 13] at 5-6. Defendants' argument regarding subject-matter jurisdiction is baseless.

As a general matter, the FAA does not grant subject-matter jurisdiction to federal district courts. It does, however, provide that "[a] party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement may petition any United States district court which, save for such agreement, would have [subject-matter] jurisdiction . . . in a civil action . . . arising out of the controversy between the parties," for an order compelling arbitration. 9 U.S.C. § 4. Under that provision, a party that wishes to have an arbitration agreement enforced may instate a federal court proceeding and ask the court to require the other party to comply with the agreement. *See, e.g.*, *Carrington Capital Management, LLC v. Spring Investment Services, Inc.*, 347 F. App'x 628, 629 (2d Cir. 2009) (summary order).

This case does not implicate that particular provision. It was Plaintiffs – who do not believe that the arbitration agreement at issue here is enforceable – who initiated this case by filing their Complaint. This Court has subject-matter jurisdiction over the federal law claims in that Complaint pursuant to 18 U.S.C. § 1331, and subject-matter jurisdiction over the state law claims in that Complaint pursuant to 18 U.S.C. § 1367(a). While the FAA may require the Court to enforce the disputed arbitration agreement as a matter of contract, *see* 9 U.S.C. § 2, Defendants have provided no authority to support the proposition that a valid arbitration agreement divests a federal court of its subject-matter jurisdiction. It would be odd if a valid arbitration agreement could have that effect, as "arbitration is simply a [private] matter of contract between the parties." *Stolt-Nielsen*, 130 S. Ct. at 193.

The Court notes that at oral argument, Plaintiffs' counsel suggested that this action could

not have initially been brought in state court because it involves a federal law claim. That suggestion is also erroneous. As a general matter, state courts and federal courts have concurrent jurisdiction over all federal law claims, and FLSA claims are no different. *See* 29 U.S.C. § 216(b) (providing that an FLSA claim can be maintained "in any Federal or State court of competent jurisdiction). A plaintiff may sue on a federal law claim either in federal court or state court. That said, if Plaintiffs had filed this action in state court, Defendants may or may not have elected to exercise their right remove the case to federal court pursuant to 28 U.S.C. § 1441(a).

## III.

The FAA "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center*, 130 S. Ct. at 2776; *see Stolt-Nielsen*, 130 S. Ct. at 1773. The FAA "places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." *Rent-A-Center*, 130 S. Ct. at 2776; *see also New River Electrical Corp. v. Blakeslee Arpaia Chapman, Inc.*, No. 3:09cv192 (MRK), 2009 WL 51111566, at *2 (D. Conn. Dec. 17, 2009); *Ferguson v. United Health Care*, No. 3:08cv1389 (MRK), 2008 WL 5246145, at *2 (D. Conn. Dec. 17, 2008). "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Center*, 130 S. Ct. at 2776 (citation omitted); *see* 9 U.S.C. § 2 (providing that arbitration agreements may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract"); *AT&T Mobility*, 131 S. Ct. at 1746. Employment contracts that include arbitration clauses are not exempt from the FAA's provisions, *see Ferguson*, 2008 WL 5246145, at *2 (citing *Circuit City Stores v. Adams*, 532 U.S. 105, 119 (2001)), and the parties appear to agree that both FLSA claims and state employment law claims may be arbitrated. *See Carter v. Countrywise Credit Industries, Inc.*, 362 F.3d 294, 297 (5th Cir.

2004); *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319-20 (9th Cir. 1996).

It is well settled that "whether parties have agreed to 'submit[] a particular dispute to arbitration' is typically an issue for judicial determination.'" *Granite Rock*, 130 S. Ct. at 2855 (citation omitted). "To satisfy itself that [an] agreement [to arbitrate] exists, [a] court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.* at 2856. Whether a particular arbitration agreement is invalid, revocable, or unenforceable is also an issue for judicial determination. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006). That said, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Id.* at 445. Thus, "unless the challenge is to the [enforceability of the] arbitration clause itself, the issue of the contract's validity is [usually] considered by the arbitrator . . . ." *Id.* at 445-46; *see JLM Industries v. Stolt-Nielsen SA*, 387 F.3d 163, 170 & n.5 (2d Cir. 2004).[5]

The standard this Court must apply when reviewing a motion to compel arbitration is essentially the same standard that the Court applies when it reviews a motion for summary judgment. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see, e.g.*, *DuBois v. Macy's East, Inc.*, 338 F. App'x 32, 33 (2d Cir. 2009) (summary order). The party seeking an order compelling arbitration must "substantiate [its] entitlement [to arbitration] by a showing of evidentiary facts" that support its claim that the other party agreed to arbitration. *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995). If the party seeking to compel arbitration makes such an evidentiary showing, the party opposing arbitration "may not rest on a denial but

---

[5] Parties may contract to have the very issue of arbitrability decided by an arbitrator, rather than a court. *See Shaw Group, Inc. v. Triplefine International Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("A referral of 'any and all' controversies reflects such a 'broad grant of power to the arbitrators' as to evidence the parties' clear 'inten[t] to arbitrate the issues of arbitrability.'" (citation omitted)). But Defendants do not argue in this case that the Lease evidences such a clear intent.

must submit evidentiary facts showing that there is a dispute of fact to be tried" as to the making of the arbitration agreement. *Id.* "If there is an issue of fact as to the making of the agreement for arbitration, then a trial [on that issue] is necessary." *Bensadoun*, 316 F.3d at 175; *see* 9 U.S.C. § 4. "Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980); *see Bensadoun v. Jobe-Riat*, 316 F.3d at 175 (citing *Par-Knit Mills* as setting forth the standard of review applicable when reviewing a motion to compel arbitration); *Sutherland v. Ernst & Young, LLP*, --- F. Supp. 2d ----, 2011 WL 838900, at *2 (S.D.N.Y. 2011).

This Court does not need to hold an evidentiary hearing to resolve purely legal issues that are raised in the context of a motion for summary judgment. *See DaimlerChrysler Insurance Co. v. Pambianchi*, --- F. Supp. 2d ----, 2011 WL 66584, at *5 (D. Conn. 2011). Similarly, when a party opposes a motion to compel arbitration on the ground that the arbitration agreement at issue is revocable "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, the Court may make its own legal finding as to the enforceability of the agreement. *American Express II*, 634 F.3d at 198; *see, e.g.*, *Sutherland*, 2011 WL 838900, at *2 (finding as a matter of law that an arbitration clause in an employment contract was unenforceable). The party opposing enforcement has the burden showing that the arbitration agreement is unenforceable. *See American Express II*, 634 F.3d at 191 (citing *Green Tree Financial Corp-Alabama v. Randolph*, 531 U.S. 79, 92 (2000)).

## IV.

The issues in this case relate to both the formation of an agreement to arbitrate, *see Granite Rock*, 130 S. Ct. at 2855, and the enforceability of the agreement to arbitrate. *See*

*Buckeye Check Cashing*, 546 U.S. at 445-46. The issues in the case relating to the formation of the agreement are reasonably straightforward. The materials in the record permit no conclusion other than that Mr. D'Antuono and Ms. Vilnit agreed to arbitration – they appear to concede as much in their briefs, though their counsel would not make that concession at the oral argument. Ms. Cruz did not. Thus, Ms. Cruz need not arbitrate her claims against Defendants and is not bound by any provision in the Lease.

The enforceability-related issues, on the other hand, were at the outset significantly more difficult. Plaintiffs object to three specific features of the Lease's arbitration clause. First, in light of the potential costs associated with arbitration before the American Arbitration Association ("AAA") and the allegedly low amount of damages they each seek individually, they object to the provision of the arbitration clause that purports to waive Plaintiffs' right to proceed against Defendants via collective actions and class actions. *See* Tab 1 to First Genna Decl. [doc. # 13-1] at 8. ("**ENTERTAINER** AGREES THAT ALL CLAIMS BETWEEN HER AND THE **CLUB** WILL BE LITIGATED INDIVIDUALLY AND THAT SHE WILL NOT CONSOLIDATE OR SEEK CLASS TREATMENT FOR A CLAIM."). Second, they object to the cost- and fee-shifting provision in the arbitration clause. *See id.* ("Any judgment, order, or ruling arising out of a dispute between the parties shall award costs incurred for the proceedings and reasonable attorney fees to the prevailing party."). Third, they object to a provision that requires that all claims against Defendants, either in a court or before an arbitrator, be filed with six month after a exotic dancer's final performance at the Clubs. *See id.* ("**ENTERTAINER** FURTHER AGREES NOT TO COMMENCE ANY ACTION, SUIT OR ARBITRATION PROCEEDING RELATING, IN ANY MANNER WHATSOEVER, TO THIS **LEASE** OR TO HER PERFORMING AT THE **PREMISES** OF THE CLUB, MORE THAN SIX MONTHS AFTER

SHE LAST PERFORMED AT THE **PREMISES**, AND FURTHER AGREES TO WAIVE ANY STATUTE OF LIMITATIONS TO THE CONTRARY."). They appear to object to all three of those features on both state and federal law grounds.

Plaintiffs argue that those three features, taken together, require the Court to invalidate the arbitration agreement and instead allow them to proceed in a collective or class action in this Court. While an arbitration clause is generally severable from the contract in which it appears, *see Granite Rock*, 130 S. Ct. at 2857, it is true that a court's invalidation of specific provisions within an arbitration clause may in some cases require invalidation of the entire arbitration agreement. *See Fensterstock v. Education Finance Partners*, 611 F.3d 124, 134 (2d Cir. 2010), *overruled in part by AT&T Mobility*, 131 S. Ct. at 1753. This is because arbitration is a matter of contract, and "parties are generally free to structure their arbitration agreements as they see fit." *Stolt-Nielsen*, 130 S. Ct. at 1774 (quotation marks and citation omitted). A court generally cannot require parties to submit to arbitration procedures with which they never agreed to comply. *See id.* at 1775 (holding that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so").

Of course, it may be permissible for a court to invalidate some non-essential provisions in an arbitration agreement, sever those provisions, and require arbitration under a modified agreement. The Supreme Court's decision in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S. Ct. at 1758, and the Second Circuit's decision in *Fensterstock v. Education Finance Partners*, 611 F.3d 124, both stand only for the limited proposition that parties may not be required to submit to class arbitration when they have not agreed to that type of arbitration procedure. *See, e.g.*, *Stolt-Nielsen*, 130 S. Ct. at 1776 (explaining why a class action mechanism would bring "fundamental changes" to the arbitration project). Neither of those cases necessarily

implies a rule that if any provision in an arbitration agreement cannot be enforced as a matter of law, the entire agreement must fall.

Plaintiffs rely on both state law and federal law to support their position. As the Court explains in further detail in the discussion below, there is virtually no Connecticut case law to support Plaintiffs' views. But there are many, many federal law precedents – and in particular, Second Circuit precedents – that support Plaintiffs' position in this case. In *American Express II*, the Second Circuit established a standard under which district courts may invalidate arbitration agreements containing collective and class action waiver provisions on a case-by-case basis. *See* 634 F.3d at 197 (citing *Green Tree Financial*, 531 US. at 92). In *Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), the Second Circuit stated that an arbitration clause containing both a provision shortening the statute of limitations and a cost- and fee-shifting provision might "significantly diminish a litigant's [statutory] rights," and thus might be invalid. *Id.* at 125-26 ("Had the defendants attempted to enforce the arbitration agreement as originally written it is not clear that we would hold in their favor.").

The Court knows of no cases from inside the Second Circuit or elsewhere in which a class action waiver provision, a cost- and fee-shifting provision, and a provision altering the statute of limitations were combined in one arbitration agreement. The fact that the arbitration clause at issue here combined some of the features which led the Second Circuit to strike down the arbitration agreement in *American Express II* with some of the different features which caused the Second Circuit considerable concern in *Ragone* make this a particularly difficult case.

Further complicating matters, just days before the oral argument in this case, the United States Supreme Court issued its decision in *AT&T Mobility*, 131 S. Ct. 1740. Regardless of one's views about the wisdom of that decision, *see* Marcia Coyle, *A Business Win in "AT&T"*, National

Law Journal, May 2, 2011, at 17 (presenting views on both sides), it would be hard to dispute that *AT&T Mobility* and other recent United States Supreme Court decisions represent a shift in the federal law regarding the enforceability of arbitration agreements. *See AT&T Mobility*, 131 S. Ct. at 1747 (discussing the "judicial hostility towards arbitration . . . [that] manifest[s] itself in 'a great variety' of 'devices and formulas' declaring arbitration against public policy"). While this case does not ultimately turn on *AT&T Mobility*'s holding, *see* 131 S. Ct. at 1753, this Court cannot overlook that decision entirely because its reasoning may be at odds with reasoning in the Second Circuit's recent cases, including *American Express II* and *Ragone*.

## A.

The Court begins with the parties' disputes over the formation of the arbitration agreement at issue in this case. *See Granite Rock*, 130 S. Ct. at 2855. The FAA requires this Court to hold a trial "[i]f the making of the arbitration agreement . . . [is] in issue." 9 U.S.C. § 4. But "the making of [an] arbitration agreement . . . [is] in issue" within the FAA's meaning only when there are material *factual* disputes regarding the elements of contract formation under the applicable state law. *Oppenheimer & Co.*, 56 F.3d at 358. Under Connecticut law – which all parties agree is the applicable law – the essential elements of contract formation are offer and acceptance. *See Auto Glass Express, Inc. v. Hanover Insurance Co.*, 293 Conn. 218, 227 (2009).

## 1.

In their briefs, Ms. D'Antuono and Ms. Vilnit seemingly concede that they accepted the terms of the arbitration clause. After all, they both signed the Lease, and the arbitration clause was on the same page as each of their signatures. At oral argument, however, Plaintiffs' counsel suggested for the first time that some of her arguments regarding Ms. D'Antuono's and Ms. Vilnit's obligations actually pertain to the formation of the arbitration agreement, rather than the

enforceability of the arbitration agreement. The Court largely disagrees with Plaintiffs' counsel's re-characterization of her arguments, but Plaintiff's counsel is correct in one respect. To the extent that Ms. D'Antuono and Ms. Vilnit argue that they were mislead about the content of the documents they signed and rushed into signing the documents, their argument goes to the formation of an agreement, rather than to enforceability. *See DiUlio v. Goulet*, 2 Conn. App. 701, 703-04 (1984).

In Connecticut, the fact that a party signed a written agreement is usually conclusive evidence of contract formation. "The general rule is that where a person of mature years, who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so." *Ursini v. Goldman*, 118 Conn. 554, 562 (1934). There is an exception to that general rule when something has "been said or done to mislead the person . . . or to put a [person] of reasonable business prudence off his [or her] guard in the matter." *Id.* Ms. D'Antuono and Ms. Vilnit relied on that exception in the portion of their sur-reply brief discussing procedural unconscionability. *See* Pls.' Sur-Reply [doc. # 44] at 15 n.8. But under Connecticut law, that exception goes to the factual issues of offer and acceptance, rather than to the legal issue of whether an agreement, once formed, may be enforced. *See DiUlio*, 2 Conn. App. at 703-04 (1984) ("[E]ven though the plaintiff signed a release, the plaintiff's deposition and counteraffidavit raise a genuine issue of material fact as to her assent to the terms of the release."); *Delk v. Go Vertical, Inc.*, 303 F. Supp. 2d 94, 100-01 (D. Conn. 2004) (finding no evidence that the plaintiff had been misled or had been put off his guard at the time when he signed the agreement at issue).

Because Ms. D'Antuono and Ms. Vilnit did not rely on the *Ursini v. Goldman* exception until they filed their sur-reply brief, and did not characterize their argument as a factual argument about the formation of an agreement until oral argument, it appears that Ms. D'Antuono and Ms. Vilnit may have waived that argument. Assuming, however, that Plaintiffs did not waive that argument, the Court still concludes that the declarations in the record from Ms. D'Antuono and Ms. Vilnit are not sufficient to raise genuine issues of material fact as to the essential elements of contract formation under Connecticut law, which again are a valid offer and a valid acceptance. *See Auto Glass Express*, 293 Conn. at 227.

The declarations from Ms. D'Antuono and Ms. Vilnit establish that Ms. Bergeron told Ms. D'Antuono that the agreement provided that Ms. D'Antuono worked for herself and that the Clubs needed a copy for their files, *see* D'Antuono Decl. [doc. # 26-2] ¶ 6; and that Ms. Bergeron told Ms. Vilnit that the agreement was tax-related. *See* Vilnit Decl. [doc. # 26-3] ¶ 5. Although those statements were incomplete, they were both true enough. No reasonable jury could conclude from the declarations that Ms. Bergeron was sufficiently misleading as to the content of the Lease to negate Ms. D'Antuono's and Ms. Vilnet's acceptance of the terms of the Lease, particularly in light of the fact that both Ms. D'Antuono and Ms. Vilnit had the opportunity to read the Lease. Although both declarations indicate that Ms. Bergeron told Ms. D'Antuono and Ms. Vilnit that they needed to sign the Lease, *see* D'Antuono Decl. [doc. # 26-2] ¶ 7; Vilnit Decl. [doc. # 26-3] ¶ 5, neither declaration indicates that Ms. Bergeron required an immediate signature, and neither shows that she in any way attempted to dissuade either Ms. D'Antuono and Ms. Vilnit from reading the Lease. *See Delk*, 303 F. Supp. 2d at 100 ("There is simply no evidence before the court that raises a genuine question as to whether Go Vertical or its

employees deprived Delk of the opportunity to review the waiver or coaxed her to avoid reading it before she signed.").

Plaintiffs' counsel's other arguments with regard to Ms. D'Antuono and Ms. Vilnit relate not to the factual issue of whether an agreement to arbitrate was formed, but to the legal issue of whether Ms. D'Antuono's and Ms. Vilnit's agreement with Defendants is enforceable. *See* 9 U.S.C. § 2; *American Express II*, 634 F.3d at 198; *Delk*, 303 F. Supp. 3d at 101 ("Delk further asserts that, even assuming she assented to its terms, the waiver is not valid . . . ."). In arguing to the contrary, Plaintiffs' counsel appears to be relying on a somewhat confusing passage from a district court decision that Plaintiffs' counsel repeatedly cited at oral argument, *Campbell v. General Dynamics Government Systems Corp.*, 321 F. Supp. 2d 142 (D. Mass. 2004). Several years before *Campbell*, the First Circuit held in *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1 (1st Cir. 1999), that a pre-dispute agreement to arbitrate discrimination claims was not "appropriate and authorized by law" within the meaning of the 1991 Civil Rights Act amendments to Title VII – and thus could not be enforced – because it did not give specific notice to the plaintiff that it required arbitration of employment claims. *Id.* at 4, 17, 20. The Second Circuit has never adopted the *Rosenberg* rule, and in one case, the Second Circuit explicitly declined to follow the *Rosenberg* court's reasoning. *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004).

In any case, the First Circuit's rule by its terms applies only to discrimination claims implicating the 1991 Civil Rights Act, and not to FLSA claims. *See Rosenberg*, 170 F.3d at 19 ("[T]his case does not implicate any broader questions of the enforceability of the arbitration clause when the 1991 CRA or ADEA are not involved."). This Court is unwilling to import that particular rule into the FLSA context, particularly since the Second Circuit has not even adopted

it in the limited context of claims implicating the 1991 Civil Rights Act.

**2.**

The only remaining dispute relating to the formation of an agreement to arbitrate is about Ms. Cruz. With regard to Ms. D'Antuono and Ms. Vilnit, there has never been any dispute that Defendants carried their initial burden of "substantiat[ing their] entitlement [to arbitration] by a showing of evidentiary facts." *Oppenheimer & Co.*, 56 F.3d at 358. With regard to Ms. Cruz, Defendants have failed to carry that initial burden. For that reason, the Court has no choice but to deny Defendants' motion with regard to Ms. Cruz.

Under Connecticut law, even when parties have not entered into a written contract, a legally binding agreement may be inferred from the parties' conduct when that conduct shows a tacit understanding, in the light of all of the surrounding circumstances. *See, e.g.*, *Sandella v. Dick Corp.*, 53 Conn. App. 213, 219 (1999) (citing *Collins v. Lewis*, 111 Conn. 299, 304 (1930)). The FAA generally requires federal courts to enforce even implied agreements to arbitrate, so long as they are set forth in some writing. *See* 9 U.S.C. § 2; *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987). For example, if an employer presents a written arbitration agreement to an employee, and the employee's consent to the agreement can be reasonably inferred from the employee's subsequent conduct, the fact that the employee never actually signed the agreement is irrelevant. *See Brown v. St. Paul Travelers Companies, Inc.*, 331 F. App'x 68, 69-70 (2d Cir. 2009) (applying New York contract law and finding no genuine dispute of material fact as to the formation of an arbitration agreement).

In this case, Defendants have not introduced any evidence that could permit a jury to reasonably infer that Ms. Cruz consented to the terms of the Lease, let alone the arbitration agreement. Defendants' counsel has asserted in a reply brief that the Lease "was written and

disseminated throughout" the Clubs and that Ms. Cruz therefore must have implicitly assented to the arbitration provision. Defs.' Reply [doc. # 38] at 22. If there were evidence that the Lease was posted in the Clubs, or that copies of the Lease were given to all new exotic dancers upon arrival, then it might be possible to infer an agreement from such a circumstance. *See Brown*, 331 F. App'x at 69-70. But defense counsel's generalized assertion is not supported by *any* evidence at all. The declarations that Defendants have introduced into the record indicate nothing more than that the Gold Club had a policy of providing a copy of the Lease to every exotic dancer *at some point*, *see* Bergeron Decl. [doc. # 38-1] ¶ 4; Second Genna Decl. [doc. # 38-2] ¶ 4, and of obtaining a signed Lease from every exotic dancer *at some later point*. *See* First Genna Decl. [doc. # 13-1] ¶ 6 ("It is [Defendants'] normal business practice to have Entertainers execute a . . . Lease, in the substantially identical form as those executed by Ms. D'Antuono and Ms. Vilnit . . . . Assuming Ms. Romona Cruz performed as an Entertainer at the Groton Gold Club . . . she would have necessarily executed . . . [a] Lease or she would not have been permitted to perform."). Defendants have not introduced any evidence at all about *when* copies of the Lease were ordinarily provided to new exotic dancers, let alone any specific evidence about when Ms. Cruz might have first been shown the Lease and arbitration agreement. *Cf.* Fed. R. Civ. P. 56(c)(4) (requiring that affidavits and declarations used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").

In fact, the only evidence before the Court indicates that Defendants often waited quite a long time before presenting new exotic dancers with copies of the Lease. According to both Ms. D'Antuono, *see* D'Antuono Decl. [doc. # 26-2] ¶ 5, and Ms. Vilnit, *see* Vilnit Decl. [doc. # 26-3] ¶¶ 4-7, Defendants waited untilnearly a year after Ms. D'Antuono and Ms. Vilnit started

performing at the Clubs to show them the Lease. Ms. Cruz only performed at the Clubs for a few months. Thus, the only reasonable inference the Court can draw based on the evidence is that Ms. Cruz never saw the Lease and had no opportunity to consent to it, or to the arbitration agreement. The Court cannot compel Ms. Cruz to arbitrate her claims against Defendants unless she in fact agreed to arbitration, *see Stolt-Nielsen*, 130 S. Ct. at 1773, and Defendants' motion is therefore DENIED IN PART.[6]

## B.

Having determined that the facts before the Court permit no reasonable conclusions other than that Ms. D'Antuono and Ms. Vilnit agreed to arbitration, and that Ms. Cruz did not, the Court now turns to the issue of the enforceability of the arbitration clause in the Lease. *See* 9 U.S.C. § 2; *American Express II*, 634 F.3d at 198. Plaintiffs contend that the arbitration clause is unenforceable under the principles of Connecticut contract law as well as under the principles of federal common law as envisioned by the passage of the FAA. *See Green Tree Financial*, 531 U.S. at 92; *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)

With regard to both state law and federal law, Plaintiffs' central argument is that the arbitration clause cannot be enforced because it requires each Plaintiff to proceed in an individual arbitration, and forbids them from bringing collective actions or class actions. At oral argument, Plaintiff's counsel backed away from the state law argument, in light of the United States Supreme Court's recent holding in *AT&T Mobility* that the FAA preempts state law rules

---

[6] Plaintiffs' counsel suggested for the first time at oral argument that because Ms. Cruz did not agree to arbitration, she may be able to bring a collective action or class action on behalf of Ms. D'Antuono, Ms. Vilnit, and others even if they are bound by the arbitration clause. The Court does not reach that argument, which was never presented in any written brief, but notes that FLSA collective or class actions may only proceed on an opt-in basis. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any . . . action [to recover damages under the FLSA] unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

conditioning the enforceability of arbitration agreements on the availability of class arbitration procedures. *See* 131 S. Ct. at 1744. However, Plaintiffs did not abandon their state law argument entirely. The Court thus considers both their state law argument and their federal law argument below. After setting forth the relevant Connecticut law – or rather, the lack thereof – the Court will examine the possible impact of *AT&T Mobility* on that state law. *See id.* at 1740.

## 1.

As the Court has already mentioned, the FAA permits federal courts to invalidate arbitration agreements based on "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center*, 130 S. Ct. at 2776; *see* 9 U.S.C. § 2. *AT&T Mobility*, 131 S. Ct. at 1746. Typically, those defenses are state law defenses. *See Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003) ("[Q]uestions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA."); *see, e.g.*, *Fensterstock*, 611 F.3d at 134; *Skirchak*, 432 F. Supp. 2d at 179. In this case, Plaintiffs do not allege fraud or duress.[7] Their only state law arguments are that that the entire Lease is unenforceable as against public policy, *see Van Voorhies v. Land/home Financial Services*, No. CV095031713S, 2010 WL 3961297, at *7 (Conn. Super. Sept. 3, 2010), and that the arbitration clause is unconscionable. *See, e.g.*, *Skirchak*, 432 F. Supp. 2d at 179 (considering a plaintiff's argument that an arbitration clause was unconscionable as a matter of Massachusetts law). Neither argument has any merit.

---

[7] They could not have prevailed even if they did. Duress consists in either physical or other improper threats which leave a person with no other choice but to manifest assent. *See* Restatement (Second) of Contracts § 174, 175 (1981). There is nothing at all in the record before the Court to suggest that Ms. D'Antuono or Ms. Vilnit signed the Lease under duress.

**a.**

Under Connecticut law, it is "well established 'that contracts that violate public policy are unenforceable.'" *Hanks v. Powder Ridge Restaurant Corp.*, 276 Conn. 314, 326 (2005); Connecticut courts may thus void contracts that contain "exculpatory provisions [that] undermine the policy considerations" underlying state laws. *Id.* at 327; s*ee also Parente v. Pirozzoli*, 87 Conn. App. 235, 246 (2005) ("[I]t is well recognized that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law."). Relying on the Connecticut Superior Court's decision in *Van Voorhies v. Land/home Financial Services*, 2010 WL 3961297, at *7, Plaintiffs appear to argue that this Court should void the entire Lease at the outset because it is designed in its entirety as an exculpatory provision authorizing labor law violations. *See* Pls.' Mem. in Opp'n [doc. # 26] at 22-23 & n.9.

The Court need not decide at this time whether the entire Lease is void as against public policy under Connecticut law. "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing*, 546 U.S. at 445-46. Thus, this Court's inquiry must be limited for now to the question of whether the *arbitration clause* is unenforceable. To the extent that Plaintiffs' public policy arguments are targeted solely at the arbitration clause, the Court believes it is appropriate to consider those arguments in the context of its discussion of the unconscionability doctrine. *See Van Voorhies*, 2010 WL 3961297, at *7. To the extent that Plaintiffs' public policy arguments are focused on other aspects of the Lease – beyond the arbitration agreement – those questions will be left for the arbitrators to ultimately resolve, since the Court will require Ms. D'Antuono and Ms. Vilnit's to submit their individual claims for arbitration. *See Buckeye Check Cashing*, 546 U.S. at 445-46; *JLM Industries*, 387 F.3d at 170 & n.5.

**b.**

"The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise." *Cheshire Mortgage Services, Inc. v. Montes*, 223 Conn. 80, 88 (1992); *see DaimlerChrysler Insurance, Inc. v. Pambianchi*, --- F. Supp. 2d ----, 2011 WL 66584, at *8 (D. Conn. 2011). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept, on the other." *Smith v. Mitsubishi Motors Credit of America, Inc.*, 247 Conn. 324, 349 (1998). Under Connecticut law, the party that raises unconscionability as a defense to the enforcement of any contract typically has the burden of showing that the contract is both procedurally and substantively unconscionable. *See Bender*, 292 Conn. at 732. "Substantive unconscionability focuses on the 'content of the contract,' as distinguished from procedural unconscionability, which focuses on the 'process by which the allegedly offensive terms found their way into the agreement.'" *Cheshire Mortgage*, 223 Conn. at 80 n.14 (quoting J. Calamari & J. Perillo, *Contracts* § 9-37 (3d ed.). In other words, the party usually must show both that there was an absence of meaningful choice on the part of that party, and that the terms of the agreement were unreasonably favorable toward the other party. *See id.* In some rare cases, a contractual provision may be so outrageous as to warrant a court's refusal to enforce it based on substantive unconscionability alone. *See Hottle v. BDO Seidman* LLP, 268 Conn. 694, 720-21 (2004). In the Court's view, Plaintiffs have not shown that the arbitration clause is either procedurally unconscionable or substantively unconscionable, let alone both.

First, Plaintiffs have not shown that the arbitration clause is procedurally unconscionable.[8] They suggest that the arbitration clause is procedurally unconscionable because

---

[8] As the Court has already indicated, there is no merit to Ms. D'Antuono's and Ms. Vilnit's

it was "hidden in a maze of fine print, [because] no effort was made to alert [them] directly to the existence of the provision[], [and because] the parties had unequal bargaining power." *Edart Truck Rental Corp. v. B. Swirsky & Co., Inc.*, 23 Conn. App. 137, 143 (1990). It is true that the Appellate Court has indicated that a contractual provision *might* be procedurally unconscionable under all three of those circumstances. *See id.*

But Plaintiffs' assertion that the arbitration clause was hidden in a maze of fine print is simply not true. The arbitration clause was printed on the last page of a four-page Lease, the same page on which both Ms. D'Antuono and Ms. Vilnit signed their names. *See* Tab 1 to First Genna Decl. [doc. # 13-1] at 8. The arbitration clause was written in ordinary-size type, in bold, capital letters, and underlined. *See id.* It could hardly have been any less hidden. *See, e.g.*, *Palacios v. Boehringer Ingelheim Pharmaceuticals, Inc.*, No. 10-22398-Civ-UU, Slip. Op. at 5 (S.D. Fla. Apr. 18, 2011) (applying Connecticut contract law and finding that an arbitration clause in a nine-page employment contract was not hidden); *Van Voorhies*, 2010 WL 3961297, at *5 (finding that an arbitration clause in a forty-five page employment contract were not hidden, and concluding that "any procedural unconscionability inherent in the arbitration agreement is minimal").

In the Court's view, Plaintiffs' procedural unconscionability argument comes down to nothing more than a claim that the parties had unequal bargaining power – as reflected by the fact that the Lease was a take-it-or-leave-it form contract – and that Defendants did not specifically direct Plaintiffs' attention to the arbitration clause in the Lease. As this Court has previously had occasion to recognize, *see DaimlerChrysler Insurance*, 2011 WL 66584, at *10,

---

argument that the Court should overlook their negligence in failing to read the Lease and arbitration agreement. That argument relates to the formation of the agreement, not to the procedural unconscionability issue.

the Connecticut Supreme Court has soundly rejected the notion that provisions in form contracts are procedurally unconscionable whenever the party with greater bargaining power fails to direct the other party's attention to important provisions. *See Smith*, 352 ("[W]e hold today that procedural unconscionability cannot be predicated solely on the failure by a commercial party preferring a form contract to an individual party to direct the individual's attention to specific terms of a contractual agreement."). Some federal courts applying other states' laws have suggested that "take it or leave it" employment contracts written by relatively sophisticated employers are *per se* procedurally unconscionable. *See Davis v. O'Melveny & Myers LLC*, 485 F.3d 1066, 1073 (9th Cir. 2007) (applying California law). Putting aside the question of whether those courts correctly applied the relevant state law, *see Roman v. Superior Court*, 172 Cal. App. 4th 1462, 1470 n.2 (2009) (holding that the adhesive nature of an employment contract does not necessary make it procedurally unconscionable), there is no such rule in Connecticut. *See, e.g.*, *Van Voorhies*, 2010 WL 3961297, at *5. The arbitration clause at issue here is thus not procedurally unconscionable under Connecticut law.

Second, Plaintiffs have not shown that the arbitration clause is substantively unconscionable under Connecticut law. It is of course true that the arbitration clause contains a collective action and class action waiver, a cost- and fee-shifting provision, and a provision shortening the statute of limitations. Defendants have now conceded that they will not enforce the latter two provisions, *see* Notice [doc. # 52], but even if they had not made that concession, this Court could only say that the arbitration clause was substantively unconscionable if the clause was one that "no man in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept, on the other." *Smith*, 247 Conn. at 349; *see DaimlerChrysler Insurance*, 2011 WL 66584, at *8. The Court is not persuaded that the three

features Plaintiffs object to – even taken together, and even assuming that Defendants had not agreed to waive enforcement of two of the three features – render the arbitration clause so unfair that no sensible person would make it and that no fair and honest person would accept it.

Plaintiffs have not cited any cases in which the Connecticut Supreme Court, applying Connecticut law, has suggested that collective action or class action waivers, cost- or fee-shifting provisions, or provisions shortening the statute of limitations, whether or not they are part of an arbitration clause, might be substantively unconscionable. In addition, Plaintiffs have not cited *any* case in which the Connecticut Supreme Court or the Connecticut Appellate Court, applying Connecticut law, has struck down either some portion of any arbitration agreement or an entire arbitration agreement as substantively unconscionable. Indeed, in the only case the Court knows of in which the Connecticut Supreme Court considered whether an arbitration agreement was substantively unconscionable, the Connecticut Supreme Court applied New York contract law and concluded that the agreement at issue was not substantively unconscionable. *See Hottle v. BDO Seidman LLP*, 268 Conn. 694, 719-21 (2004). In the absence of any controlling ruling from the Connecticut Supreme Court, this Court must make an attempt to discern how the Connecticut Supreme Court would rule, "after giving proper regard to relevant rulings of other courts of the State." *Lander v. Hartford Life & Annuity Insurance Co.*, 251 F.3d 101, 119 (2d Cir. 2011).

The portions of Plaintiffs' briefs discussing substantive unconscionability are filled with references to cases involving other states' contract law, *see, e.g.*, *Kristian v. Comcast Corp.*, 446 F.3d 25, 60 (1st Cir. 2006) (discussing California contract law), but virtually devoid of any references to cases involving Connecticut law and cases decided by Connecticut courts. Plaintiffs have not cited any Connecticut Appellate Court cases at all in support of their substantive unconcionability argument. The only Connecticut Superior Court decision Plaintiffs rely on is

*Van Voorhies*, a case in which the parties chose California law as the governing substantive law. *See* 2010 WL 3961297 at *3. The *Van Voorhies* court explicitly applied the California Supreme Court's ruling that "a mandatory arbitration clause in an employment agreement could not require an employer and an employee to share costs," and that arbitration agreements containing such requirements are substantively unconscionable. *Id.* at *6 (citing *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83, 110-11 (2000)).

While California courts have tended to look upon arbitration agreements with disfavor, *see Discover Bank v. Superior Court*, 36 Cal. 4th 148, 153 (2005); *Armendariz*, 24 Cal. 4th at 110-11, in Connecticut, "arbitration is a favored procedure" because it is "intended to avoid the formalities, the delay, the expense and the vexation" that are usually associated with ordinary litigation. *Waterbury Teachers Association v. City of Waterbury*, 164 Conn. 426, 434 (1973). Connecticut's preference for arbitration is even embodied in a statute that tracks the language of the FAA. *See* Conn. Gen. Stat. § 52-409. The three features of the arbitration agreement that Plaintiffs object to – the collective action and class action waiver, the cost- and fee-shifting provision, and the provision shortening the statute of limitations – all have a general tendency to reduce the formalities, the delays, the expenses, and the vexation associated with ordinary litigation. That is, they further the very goals that make arbitration a favored procedure in Connecticut. *See Waterbury Teachers Association*, 164 Conn. at 434; *cf. AT&T Mobility*, 131 S. Ct. at 1749 ("The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute."). It may be true that under the particular circumstances here, the features of the arbitration clause make it more difficult or less attractive for Plaintiffs to pursue their claims against Defendants. *See American Express II*, 634 F.3d at 188. But under different circumstances that are not before the Court –

after all, the arbitration clause applies to all disputes between exotic dancers and the Clubs, not just wage and hour disputes – those features might well benefit the dancers, rather the Clubs. The arbitration clause at issue here is not substantively unconscionable.

If the Court were to accept Plaintiffs' argument that the arbitration clause is substantively and procedurally unconscionable as a matter of Connecticut law, the Court would have to confront a problem that the parties did not brief and did not address at oral argument. As the Court has already discussed, the Connecticut Supreme Court has never indicated that collective action and class action waivers, cost- and fee-shifting provisions, or provision shortening the statute of limitations can render an arbitration agreement unenforceable. But the California Supreme Court held in *Discover Bank v. Superior Court* that class action waivers can render arbitration agreements invalid as a matter of state law under some circumstances. *See* 36 Cal. 4th at 153. However, in *AT&T Mobility*, the United States Supreme Court concluded that California's *Discover Bank* rule is not a "ground[] . . . exist[ing] at law or in equity for the revocation of any contract." *AT&T Mobility*, 131 S. Ct. at 1745. The United States Supreme Court reasoned that the *Discover Bank* rule embodied "a doctrine normally thought to be generally applicable," but that had "been applied in a fashion that disfavors arbitration." *Id.* at 1747. Thus, the United States Supreme Court held that *Discovery Bank* rule was preempted by the FAA. *See id.* at 1753.[9]

If the Court were to conclude – based on nothing more than a guess, as the Connecticut Supreme Court has never considered the issue – that arbitration agreements that include collective action and class action waivers, cost- and fee-shifting provisions, provision shortening the statute of limitations, or some combination of the three, are unconscionable as a matter of

---

[9] In *Fensterstock v. Education Finance Partners*, the Second Circuit held that the FAA did not preempt California's *Discover Bank* rule. *See Fensterstock*, 611 F.3d at 134. *AT&T Mobility* thus directly overruled the Second Circuit's holding in that case. *See* 131 S. Ct. at 1753.

Connecticut law, it would be incumbent upon this Court to consider the United States Supreme Court's preemption analysis in *AT&T Mobility*. *See* 131 S. Ct. at 1746-1753. Such a state law rule, if it existed, might well be preempted by the FAA. *See id.* at 1749 ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration. They have repeatedly described the Act as embodying a national policy favoring arbitration, and a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." (quotation marks, alterations, and citations omitted)); *Day v. Persels & Associates*, No. 8:10cv2463-T-33TGW, 2011 WL 177300, at *5, *7 (M.D. Fla. May 9, 2011 2011); *Zarandi v. Alliance Data Systems Corp.*, No. CV 10-8309 DSF (JCG), 2011 WL 1827228, at *2 (C.D. Cal. May 9, 2011). It is not necessary for the Court to consider whether the FAA would preempt Connecticut law to the extent that it required invalidation of an arbitration agreement like the one at issue in this case, since the Court has no reason whatsoever to believe that the Connecticut Supreme Court would invalidate such an agreement.

The Court notes that at oral argument, Plaintiffs' counsel conceded the reasoning of *AT&T Mobility* indicates that federal law trumps state substantive unconscionability principles as applied to arbitration agreements, but suggested that the decision does not impact state procedural unconscionability principles. But the *AT&T Mobility* decision explicitly refuses to draw the distinction Plaintiffs' counsel suggests. *See* 131 S. Ct. at 1749 (reasoning that the federal policy favoring arbitration agreements cannot be displaced by *either* substantive or procedural unconscionability principles). To the contrary, this Court reads the *AT&T Mobility* decision as casting significant doubt on virtually *any* "device [or] formula" which might be a vehicle for "judicial hostility toward arbitration." *Id.* at 1747.

**2.**

While the "generally applicable contract defenses," *Rent-A-Center*, 130 S. Ct. at 2776, that permit this Court to invalidate an arbitration agreement are usually state law defenses, federal courts have also developed a federal common law regarding the enforceability of arbitration agreements, purportedly under the auspices of the FAA. *See, e.g.*, *American Express II*, 634 F.3d at 188 (evaluating "the enforceability of . . . class action waivers under the federal substantive law of arbitrability"). Relying on that body of federal common law, Plaintiffs argued that the arbitration agreement at issue here is unenforceable because it imposes prohibitively expensive costs on them, thus precluding them from vindicating their federal statutory rights under the FLSA. *See id.* at 197. Though they further argue that the agreement is unenforceable because of its cost- and fee-shifting provision and its statute of limitations provision, *see Ragone*, 595 F.3d at 125-26, Defendants have now agreed not to enforce those two provisions. *See* Notice [doc. # 52].

There is considerable uncertainty surrounding the precise metes and bounds of the federal common law of arbitrability. As the Court explains below, the notion that there is such a thing as a federal common law of arbitrability emerged from language two United States Supreme Court cases. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985); *Green Tree Financial*, 531 U.S. at 90. The Second Circuit followed the latter case for the first time in *In re American Express Merchants' Litigation* ("*American Express I*"), 554 F.3d 300 (2d Cir. 2009), a decision that the United States Supreme Court subsequently vacated and remanded. *See American Express Co. v. Italian Colors Restaurant* ("*Italian Colors*"), 130 S. Ct. 2401 (2010). On remand, the Second Circuit reaffirmed its earlier decision, despite an intervening United States Supreme Court case, *see Stolt-Nielsen*, 130 S. Ct. at 1764, that arguably cast doubt

on some elements of the federal common law theory as articulated in the Second Circuit's earlier decision. *See American Express II*, 634 F.3d at 191. After *American Express II*, the United States Supreme Court decided yet another case that calls at least some aspects of the federal common law of arbitrability theory into further doubt. *See AT&T Mobility*, 131 S. Ct at 1740. Because of the uncertainty surrounding the precise boundaries of the theory, the Court will discuss the development of that theory in the United States Supreme Court and in the Second Circuit below, even though Defendants' recent concession, *see* Notice [doc. # 52], renders it unnecessary for the Court to reach some of the most difficult issues in this case.

### a.

At one time, following the Second Circuit's decision in *American Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968), "the Courts of Appeal . . . uniformly held that the rights conferred by the antitrust laws were of a character inappropriate for enforcement by arbitration." *Mitsubishi Motors*, 473 U.S. at 620-21 (quotation marks and citation omitted). But in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the United States Supreme Court disapproved the *American Safety* doctrine – at least in the international arbitration context, as the case involved an international arbitration – and established a new framework for determining whether "Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum." *Id.* at 628.

Under the *Mitsubishi Motors* framework, federal statutory claims are generally arbitrable unless Congress's intention to protect against waiver of the right to litigate in court is "deducible from [the statute's] text or legislative history." *Id.*; *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (providing that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of particular statutory

claims). Applying its new framework in *Mitsubishi Motors*, the United States Supreme Court determined that Congress did not intend to preclude arbitration of antitrust claims. *See* 473 U.S. at 628. The Second Circuit has applied the *Mitsubishi Motors* statutory interpretation framework in numerous cases. *See, e.g.*, *JLM Industries*, 387 F.3d at 181 (holding that Congress did not intend to preclude arbitration of horizontal price-fixing antitrust claims).

While *Mitsubishi Motors* primarily provides a test for determining whether Congress intended to preclude arbitration of specific statutory claims, a single footnote in *Mitsubishi Motors* suggests that federal courts might in some circumstances have power to strike down arbitration agreements even absent any evidence of congressional intent to preclude arbitration. *See* 473 U.S. at 637 n.19. That single footnote provides that "in the event [that] choice-of-forum and choice-of-law clauses [in an arbitration agreement] operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." 473 U.S. at 637 n.19. The statement in that footnote was a dictum, in that it was in no way necessary to resolve the case. *See Piscotano v. Murphy*, No. 3:04cv682 (MRK), 2005 WL 1424394, at *3; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 64 n.19 (1989) (noting that "however helpful it might be . . . to adjudge every pertinent statutory and constitutional issue" that could arise in the application of a decision, a court "cannot properly reach out and decide matters not before" it).

The United States Supreme Court's statement in the *Mitsubishi Motors* footnote does not specify whether the source of law that could permit a court to strike down such an agreement is state contract law – in that case, the Puerto Rico's contract law – or some federal law source. *See* 473 U.S. at 621. In addition, it does not specify whether it sets forth a generally-applicable rule, or one whose application is limited to the antitrust context. *See id.* at 637 n.19. As a result, in the

years after *Mitsubishi Motors*, some federal courts read the statement in the footnote extremely narrowly, and in some cases even went so far as to disregard it altogether. *See, e.g.*, *Richards v. Lloyd's of London*, 135 F.3d 1289, 1295 (9th Cir. 1998) (en banc) ("Without question this case would be easier to decide if this footnote in *Mitsubishi* had not been inserted. Nevertheless, we do not believe dictum in a footnote regarding federal antitrust law outweighs the extended discussion and holding in *Scherk* on the validity of clauses specifying the forum and applicable law."). Initially, the Second Circuit was one of the courts that seemed to disregard the *Mitsubishi Motors* footnote altogether. *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 851 (2d Cir. 1987) ("[A]fter *Mitsubishi*, 'determining statutory claims to be nonarbitrable on the basis of some judicially recognized public policy rather than as a matter of statutory interpretation is no longer permissible.'" (citation omitted)).

However, six years after it first stated that *Mitsubishi Motors* absolutely forbids the use of broad public policy considerations to strike down arbitration agreements, *see id.*, the Second Circuit relied for the first time on the *Mitsubishi Motors* footnote. In *Roby v. Corporation of Lloyds*, 996 F.2d 1353 (2d Cir. 1993), the Second Circuit cited the *Mitsubishi Motors* footnote as setting forth a generally-applicable federal law rule permitting federals courts to strike down an arbitration agreement that, in effect, served as a prospective waiver of federal statutory rights. *See id.* 1364. Although the Second Circuit did not ultimately invalidate the arbitration agreement at issue in that case, it did indicate "concern[] . . . that the clauses [in the agreement] may operate 'in tandem' as a prospective waiver of the statutory remedies for securities violations." *Id.*

The United States Supreme Court's decision in *Green Tree Financial Corp-Alabama v. Randolph*, 531 U.S. at 79, appears to have vindicated the Second Circuit's latter view, at least in part. One of the two questions presented in *Green Tree Financial* was "whether an arbitration

agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." *Id.* at 82. The United States Supreme Court answered that question in the negative. *See id.* However, the United States Supreme Court also noted that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Id.* at 90. Thus, the United States Supreme Court indicated at the end of its decision that a party could avoid arbitration by showing a "likelihood of incurring" prohibitive costs in arbitration. *See id.* at 92.

As a technical matter, the standard that the United States Supreme Court set forth in the closing paragraphs of its decision in *Green Tree Financial* was also dicta, as it contemplated alternative circumstances that were not presented in the case. *See, e.g.*, *National Aeronautics and Space Administration v. Nelson*, 131 S. Ct. 746, 751 (2011) (assuming, without deciding, that the Constitution protects a right to informational privacy). The plaintiff in *Green Tree Financial*, who alleged violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* among other statutes, had not introduced any materials into the record to show that arbitration would be prohibitively expensive. *See Green Tree Financial*, 531 U.S. at 91. But "as the Second Circuit has recognized, there is dicta and then there is dicta." *Piscotano*, 2005 WL 1424394, at *3 (citing *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975)). Unlike the single footnote in *Mitsubishi Motors*, the carefully constructed standard set forth in *Green Tree Financial* is obviously designed to guide lower courts' resolution of arbitrability questions, and thus constitutes a judicial dictum that lower courts have no choice but to follow. *See United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975). All the Courts of Appeal have appropriately adopted that standard. *See Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 780 (10th Cir. 2010); *American Express I*, 554

F.3d at 315-16; *E.E.O.C. v. Woodmen of World Life Insurance Society*, 479 F.3d 561, 566 (8th Cir. 2007); *Kristian v. Comcast Corp.*, 446 F.3d 25, 51 (1st Cir. 2006); *Musnick v. King Motor Co. of Fort Lauderdale*, 325 F.3d 1255, 1259 (11th Cir. 2003); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 659-60 (6th Cir. 2003); *Investment Partners, LP v. Glamour Shots Licensing, Inc.*, 298 F.3d 314, 318 (5th Cir. 2002); *McCaskill v. SCI Management Corp.*, 285 F.3d 623, 626 (7th Cir. 2002), *rehearing granted and vacated*, 298 F.3d 677 (7th Cir. 2002); *Blair v. Scott Specialty Gates*, 283 F.3d 595, 607 (3d Cir. 2002); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 895 (9th Cir. 2002); *LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 708 (D.C. Cir. 2001); *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556-57 (4th Cir. 2001).

The Second Circuit was one of the last of the federal Courts of Appeal to follow the *Green Tree Financial* standard. *See American Express I*, 554 F.3d at 315-16. *American Express I* involved a contract between a major credit card company and the merchants whose businesses accepted the card. *See id.* at 301. The arbitration clause in the contract between the credit card company and its merchant contained a provision purporting to waive the merchants' rights to pursue class actions against the credit card company. *See id*. The merchants nonetheless attempted to sue the credit card company in federal court for antitrust violations, and the Second Circuit concluded that the class action waiver provision in the arbitration agreement was unenforceable as a matter of federal common law. *See* 554 U.S. at 320.

Much of the Second Circuit's reasoning in *American Express I* involved a straightforward application of the *Green Tree Financial* standard. The Second Circuit reasoned that the United States Supreme Court's decision in *Green Tree Financial* was controlling, to the extent that it stated "that when a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the

likelihood of incurring such costs." *American Express I*, 554 F.3d at 315 (quotation marks and citation omitted). The evidence in the record indicated that the costs of an individual arbitration, including the cost of retaining expert witnesses, could exceed $1 million, and that no individual plaintiff's treble damages would exceed $40,000. *See id.* at 317. Moreover, the Second Circuit reasoned, it did not appear that the arbitration procedures would permit any plaintiff to recover expert witness fees. *See id.* at 318. Although attorney fees were available to a prevailing plaintiff under the antitrust laws, a plaintiff could not be assured of victory and thus needed to "include the risk of losing . . . in [its] evaluation of the[] suit's potential costs." *Id.* The Second Circuit concluded based on that evidence that the plaintiffs had satisfied their burden under *Green Tree Financial*. *See id.* at 316-17.

In some respects, however, the Second Circuit's reasoning in *American Express I* went farther than the United States Supreme Court's reasoning in *Green Tree Financial*. The final pages of the decision include a section entitled "Two Caveats." *Id.* at 320. In that section, the Second Circuit indicated that, in determining whether a class action waiver provision in an arbitration agreement is or is not enforceable, federals courts should look to a wide variety of circumstances "includ[ing], but . . . not limited to, the fairness of the provisions, the cost to an individual plaintiff of vindicating the claim when compared to the plaintiff's potential recovery, the ability to recover attorneys' fees and other costs and thus obtain legal representation to prosecute the underlying claim, the practical affect that waiver will have on a company's ability to engaged in unchecked market behavior, and related public policy concerns." *American Express I*, 554 F.3d at 320 (quoting *Dale v. Comcast Corp.*, 498 F.3d 1216, 1224 (11st Cir. 2007)). The Second Circuit indicated in its reasoning that the need to consider broad "public policy" issues was particular pressing in the antitrust context, citing the United States Supreme

Court's footnote in *Mitsubishi Motors*. *See American Express I*, 554 F.3d at 319.  But while that portion of the decision contains repeated references to antitrust-related concerns, it is not entirely clear that the Second Circuit intended its reasoning to be limited to the antitrust context.

While the Second Circuit concluded in *American Express I* that the class action waiver provision in the contract was not enforceable, it declined to decide whether its invalidation of that specific provision required invalidation of the entire arbitration clause. The Second Circuit reasoned that it did not need to determine whether the class action waiver provision was severable from the arbitration agreement since the defendants had indicated before the district court judge that they might not seek to enforce the arbitration agreement in the event that a court were to strike down the class action waiver provision. *See id.* at 321. Thus, the Second Circuit resolved the appeal by remanding the case to the district court in order to permit the defendants to voluntarily withdraw their motion to compel arbitration. *See id.* at 321.

In *Ragone*, a decision that came only a few months after *American Express I*, the Second Circuit expanded even further on that earlier decision's reasoning. *See Ragone*, 595 F.3d at 125-26. *Ragone* was an employment discrimination case in which the plaintiff asserted both federal and state law claims against a television studio. *See id.* at 117. The plaintiff's employment contract with the studio contained an arbitration clause that included a provision requiring the plaintiff to file a demand for arbitration within ninety days after any claim she might have against the studio accrued. *See id.* at 123. It also contained a provision requiring that attorney's fees by awarded to the prevailing party in any arbitration. *See id.* at 119. The plaintiff argued that those two provisions, among others, made the arbitration clause unconscionable and therefore unenforceable under New York law. *See id.* at 118.

The Second Circuit declined to decide whether the two offending provisions did or did

not make the arbitration clause unconscionable because the employer had agreed not to enforce those two provisions in arbitration. *See id.* at 124 ("We believe that New York law would allow for the enforcement of the arbitration agreement as modified by the defendants' waivers."). Nevertheless, just as the final pages of the Second Circuit's decision in *American Express I* included a "Two Caveats" section, 554 F.3d at 320, the final pages of the Second Circuit's decision in *Ragone* included a similar section entitled "A Note of Caution." 595 F.3d at 125.

In that section in *Ragone*, the Second Circuit indicated that it agreed to require arbitration "with something less than robust enthusiasm." *Id.* The Second Circuit cited the United States Supreme Court's *Mitsubishi Motors* footnote, and reasoned that the federal common law of arbitrability empowered federal courts to strike down as contrary to federal policy any arbitration agreement that effectively served as a prospective waiver of any party's right to pursue statutory remedies. *See Ragone*, 595 F.3d at 125. Second Circuit explained that it had applied "these principles" in *American Express I. Ragone*, 595 F.3d at 125. While the portions of *American Express I* decision that had discussed the *Mitsubishi Motors* footnote contained some indications that the Second Circuit's decision was justified by specifically antitrust-related concerns, *see American Express I*, 554 F.3d at 319, *Ragone* did not involve any antitrust claims. The Second Circuit explained that the concerns expressed in the *Mitsubishi Motors* footnote and in *American Express I* applied equally in the context of Title VII claims. *See Ragone*, 595 F.3d at 125-26.

The Second Circuit strongly indicated that if the television studio had not agreed to waive enforcement of the two offending provisions, it might well have invalidated the arbitration clause in the plaintiff's employment contract. *See id.* at 125 ("Had the defendants attempted to enforce the arbitration agreement as originally written it is not clear that we would hold in their favor."). The Second Circuit explained that "the arbitration agreement signed by Ragone includes both a

ninety-day statute of limitations for filing an arbitration claim and a fee-shifting provision that requires that fees be awarded to the prevailing party." *Id.* at 125-26. The Second Circuit expressed tentative agreement with the plaintiff that the two provisions, taken together, "would significantly diminish a litigant's rights under Title VII." *Id.* at 126. It indicated that "had defendants not waived enforcement, it is at least possible" that it would have voided the entire arbitration agreement as inconsistent with the FAA. *Id.*

In spite of the Second Circuit's hint to the defendants in *American Express I*, the defendants in *American Express I* decided not to voluntarily withdraw their motion to compel arbitration. Instead, they petitioned the United States Supreme Court for a writ of certiorari. *See* Petition for Writ of Certiorari, *Italian Colors*, 130 S. Ct. at 2401, 2009 WL 1511739, at *1 (No. 08-1473). In their petition, they argued that the Second Circuit's decision was contrary to *Green Tree Financial*, which permits nothing more than an inquiry into any costs that are unique to arbitration, "such as the need to pay an arbitrator's potentially significant fees." *Id.* at *18. Instead, the Second Circuit's decision rested on the amount of attorney fees and expert fees that would be needed for a plaintiff to prevail, which a plaintiff would of course incur either in court or before an arbitrator. *See id.*

In the meantime, after the Second Circuit issued its decisions in *American Express I* and *Ragone*, but while the *American Express I* defendants' petition for a writ of certiorari was pending, the United States Supreme Court issued a decision in *Stolt-Nielsen*. *See* 130 S. Ct. at 1758. The issue in that case was whether a court could require parties to arbitrate claims on a class basis when they had not explicitly agreed to do so. *See id.* at 1764. The United States Supreme Court held that it is impermissible to impose class arbitration on parties when their arbitration agreements are silent as to that issue. *See* 130 S. Ct. at 1775. In other words, the

*default position* when parties agree to arbitration is that they agree only to individual, rather than to class-wide, arbitration.

It is possible to read *Stolt-Nielsen* as rather strongly indicating that arbitration agreements that contain class action waiver provisions are fully enforceable under federal law. The plaintiffs in *Stolt-Nielsen* had argued before the arbitrators that an agreement to use class action procedures should be inferred from the parties' arbitration agreement, since an arbitration agreement that did not so provide would be either void against public policy or unconscionable. *See id.* at 1768. The arbitrators' decision to infer such a provision appeared to have rested on the plaintiffs' public policy argument – although, as the United States Supreme Court later pointed out, the arbitrators did not specify the ground of their decision, nor whether it rested on federal law or state law. *See id.* at 1768. Contrary to that decision, the United States Supreme Court reasoned that parties who agree to arbitration may freely elect to limit available arbitration procedures, and that courts and arbitrators alike must honor such agreements. *See id.* at 1774-75.

In light of the intervening decision in *Stolt-Nielsen*, the United States Supreme Court granted the *American Express I* defendant's petition for a writ of certiorari, and vacated and remanded the Second Circuit's *American Express I* decision for further consideration. *See Italian Colors*, 130 S. Ct. at 2401. However, before the Second Circuit had an opportunity to reconsider its *American Express I* decision, the Second Circuit decided another arbitration-related case in which it read *Stolt-Nielsen*'s holding very narrowly. *See Fensterstock*, 611 F.3d at 124.

*Fensterstock* was the first case in which the Second Circuit had an opportunity to construe the meaning of the United States Supreme Court's decision in *Stolt-Nielsen*. *See* 611 F.3d at 140. *Fensterstock* was a diversity case, involving California law claims that a lender engaged in fraudulent and deceptive practices in connection with student loan servicing. *See id.*

at 127. Applying the same California contract law that the United States Supreme Court found to be preempted by the FAA in *AT&T Mobility*, *see Discover Bank*, 36 Cal. 4th at 156, the Second Circuit found that a clause in the student loan contract's arbitration agreement waiving the right to proceed via class action was unconscionable. *See Fensterstock*, 611 F.3d  at 138.[10]

Having struck down the class action waiver provision at issue in the case as a matter of California contract law, the Second Circuit turned to the single issue that it had left unresolved in *American Express I*, 554 F.3d at 321: if a court invalidated a provision in an arbitration clause that forbade the use of a class action mechanism, could the arbitration clause itself survive? *See Fensterstock*, 611 F. 3d at 140. Or, in other words, could the class action waiver provision be severed from the arbitration clause? *See id.* The Second Circuit concluded that *Stolt-Nielsen*, 130 S. Ct. at 1758, provided a clear answer. *See Fensterstock*, 611 F.3d at 140.

The Second Circuit reasoned that *Stolt-Nielsen* stood for the proposition that "the FAA embodies a preference not so much for arbitration as for the enforcement of arbitration agreements." *Fensterstock*, 611 F.3d at 141. If parties have agreed to individual arbitration only, but their agreement to forego class proceedings is unenforceable as a matter of law, the parties cannot be forced to proceed to arbitration on a class basis. *See id.* at 140. Thus, the Second Circuit reasoned, *Stolt-Nielsen* required that the entire arbitration clause be invalidated because of that single offending provision. *See id.* at 141.

The Second Circuit's decision on remand in *American Express II* took its cue from *Fensterstock*. After reconsidering its decision in light of *Stolt-Nielsen*, the Second Circuit panel that decided *American Express I* reaffirmed its earlier decision. *See American Express II*, 634

---

[10] As the Court previously noted, *AT&T Mobility* directly overruled the Second Circuit's holding in *Fensterstock* that the FAA did not preempt the *Discover Bank* rule. *See Fensterstock*, 611 F.3d at 134.

F.3d at 194.[11] Specifically, the Second Circuit reasoned:

> *Stolt-Nielsen* states that parties cannot be forced to engage in a class arbitration absent a contractual agreement to do so. It does not follow, as Amex argues, that a contractual clause barring class arbitration is *per se* enforceable. Indeed, our prior holding focused not on whether the plaintiffs' contract provides for class arbitration, but on whether the class action waiver is enforceable when it would effectively strip plaintiffs of their ability to prosecute alleged antitrust violations.

634 F.3d at 193-94. According to the Second Circuit, then, the only effect *Stolt-Nielsen* had was to "alter what relief t[he court could] order." *Id.* at 199. The Second Circuit reaffirmed its conclusion that the merchant plaintiffs had carried their burden of showing that they were likely to incur prohibitive costs if they were required to pursue their extremely low-value antitrust claims against the credit card company defendant by way of individual arbitrations, again citing *Green Tree Financial*, 531 U.S. at 90, and *Mitsubishi Motors*, 473 U.S. at 637. *See American Express II*, 634 F.3d at 197.

The reasoning of *American Express II* is just as expansive as the reasoning of *American Express I*. Like *American Express I*, *see* 554 F.3d at 319, *American Express II* favorably cites the *Mitsubishi Motors* footnote for the broad proposition that the procedures available under a particular arbitration agreement may implicate general federal "public policy" concerns and require invalidation of the arbitration agreement. *See American Express II*, 634 F.3d at 197. It specifically repudiated the argument that "*Stolt-Nielsen* . . . rejects the use of public policy as a basis for finding contractual language void." *Id.* at 199. *American Express II* also expressly provides that "[t]he two caveats we articulated in our original opinion still apply." *Id.*

---

[11] To be precise, only two of the three Second Circuit judges who decided *American Express I* participated in the case on remand, as then-Judge Sonia Sotomayor was a member of the original panel before she became an Associate Justice. *See American Express II*, 634 F.3d at 188 n.1.

**b.**

The United States Supreme Court has not overruled *American Express II*, *Ragone*, or any of the other cases adopting as a federal common law rule that courts may refuse to enforce arbitration agreements when, under the circumstances, they prevent plaintiffs from effectively vindicating their federal statutory rights. *See Green Tree Financial*, 531 U.S. at 90. It has never expressly called into doubt either its *Mitsubishi Motors* footnote or its reasoning and statements in *Green Tree Financial*. Furthermore, the Second Circuit has never cast any doubt on the continuing validity of *American Express II* or *Ragone*. Nevertheless, it would not be appropriate to ignore the impact that the United States Supreme Court's recent decision in *AT&T Mobility*, 131 S. Ct. at 1740, may have on the validity of *American Express II* and other lower court cases that have relied on the federal common law of arbitrability to invalidate arbitration agreements.

*AT&T Mobility* contains the most thorough analysis the United States Supreme Court has yet provided regarding the meaning of 9 U.S.C. § 2, which provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* As set forth in *AT&T Mobility*, that provision was designed to overcome the "judicial hostility towards arbitration . . . [that] had manifested itself in 'a great variety' of 'devices and formulas' declaring arbitration *against public policy*." 131 S. Ct. at 1747 (emphasis added). As such, the United States Supreme Court construed the provision to "permit[] agreements to arbitrate to be invalidated by generally applicable contract defenses . . . but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 1746 (quotation marks and citation omitted).

As the Court has already discussed, the United States Supreme Court's holding in *AT&T Mobility* was quite limited. The precise question presented in the case was whether Califonia's

*Discover Bank* rule, which "classif[ied] most collective-arbitration waivers in consumer contracts as unconscionable" was preempted by the FAA. *Id.* The United States Supreme Court ultimately held that that California's *Discover Bank* rule was preempted – even though it appeared on its face to be a generally applicable contract law rule – because it was "applied in a fashion that disfavor[ed] arbitration." *Id.* at 1747.[12]

The Court recognizes that the United States Supreme Court's holding in *AT&T Mobility* only implicated federal preemption of a particular state law rule. But the Court knows of no principled reason why federal law rules that have essentially the same purpose and effect as the *Discover Bank* rule would continue to be permissible after *AT&T Mobility*. *See id.* at 1753 ("The dissent claims that class proceedings are necessary to prosecute small-dollar claims that might otherwise slip through the legal system. But States cannot require a procedure that is inconsistent with the FAA, even it is desirable for unrelated reasons." (citation omitted)); *id.* at 1760 (Breyer, J., dissenting) (describing the *Discover Bank* rule as a means of ensuring that "small-dollar claimants [do not] abandon their claims rather than . . . litigate"). It is at least arguable that after *AT&T Mobility*, the federal common law of arbitrability standards set forth in *American Express II* and other cases may require some modification to ensure that they will not be "applied in a fashion that disfavors arbitration." *Id.* at 1747.

That said, there are some caveats in the United States Supreme Court's decision in *AT&T Mobility* that could conceivably be read as vindicating decisions like *American Express II*. To be clear, none of the three opinions in *AT&T Mobility* cites either *Green Tree Financial* or the

---

[12] As commentators have already pointed out, the United States Supreme Court's interpretation of the FAA in *AT&T Mobility* is just that – an interpretation of a statute. Editorial, *Carving Out Class-Action Exceptions*, L.A. Times, May 17, 2011, http://www.latimes.com/news/opinion/opinionla/la-ed-classaction-20110517,0,7127456.story. Congress is free to override the United States Supreme Court's interpretation of the FAA if it wishes to do so.

*Mitsubishi Motors* footnote. That said, in response to the dissenters' argument that class proceedings were necessary under the circumstances presented in the case to allow the plaintiffs to prosecute their small-dollar claims, *see AT&T Mobility*, 131 F.3d at 1760-61 (Breyer, J., dissenting), the majority expressly pointed out that the claim at issue in the case was "unlikely to go unresolved" if the arbitration agreement was enforced. *Id.* at 1753.

### c.

This Court has doubts about the continuing validity of *Ragone*. Because the Second Circuit decided that case before the Supreme Court's decisions in *Stolt-Nielsen* and *AT&T Mobility*, the panel that decided the appeal in that case did not have the benefit of the Supreme Court's reasoning in those two cases. However, the Court remains obligated to follow *Ragone* here, and *Ragone* could hardly be any clearer. It strongly indicates that when a plaintiff seeks to vindicate federal statutory rights, an arbitration clause that both requires the plaintiff to pay the defendants' costs and fees if she does not prevail *and* contractually shortens the statute of limitations on the plaintiff's federal law claim cannot be enforced. *See Ragone*, 595 F.3d at 125. Unless and until either the Second Circuit or the United States Supreme Court disavows that strong indication, this Court will continue to follow it.

Furthermore, even if *Ragone* did not indicate that those two provisions, when combined, can have the effect of preventing a plaintiff from vindicating important federal statutory rights, this Court would likely hold that the FLSA's statute of limitations cannot be contractually shortened. As the Ninth Circuit has recognized in a line of cases that this Court finds persuasive, the FLSA's statute of limitations provision, *see* 29 U.S.C. § 255, is part and parcel of a federally-guaranteed substantive right. *See David v. O'Melveny & Myers*, 485 F.3d 1066, 1077 (9th Cir. 2007); *Graham Oil Co. v. Arco Products Co.*, 43 F.3d 1244 (9th Cir. 1994). No business may

require a worker – regardless of how that worker is classified – to forfeit that federally-guaranteed right as a precondition of employment. Thus, even absent the Second Circuit's guidance in *Ragone*, this Court very likely would invalidate the statute of limitations provision in the arbitration agreement, at least insofar as that provision shortens the statute of limitations on federal statutory claims such as FLSA claims. In light of the broad severability clause in the Lease, *see* Tab 1 to First Genna Decl. [doc. # 13-1] at 8, however, the Court would likely sever that particular provision from the arbitration clause instead of striking down the entire arbitration clause as contrary to federal law.

In any event, however, Defendants have unconditionally conceded that they will not seek to enforce either the cost- and fee-shifting provision or the statute of limitations provision in the Lease. *See* Notice [doc. # 52]. *Ragone* holds that when a defendant agrees not to enforce such offending provisions, a district court may require arbitration in light of the defendant's concession. *See* 595 F.3d at 125 (finding that an arbitration agreement was enforceable "as modified by the defendants' waivers" as to the various objectionable features of the agreement); *see also Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294, 300 (5th Cir. 2004) (finding that a plaintiff's objection to a fee-shifting provision in an arbitration clause was mooted by the defendant's agreement to pay the costs of arbitration). There is thus no risk whatsoever that either Ms. D'Antuono or Ms. Vilnit will be required to bear Defendants' arbitration costs, *see Carter*, 362 F.3d at 300, and no risk that their claims will be dismissed due to the fact that it has been more than six months since either Ms. D'Antuono or Ms. Vilnit performed at the Clubs.

Plaintiffs' counsel believes that Defendants should be required to make their concession with regard to *every* exotic dancer who ever signed the Lease. *See* Mot. for Clarification [doc. # 53] at 1-2. Plaintiffs' counsel also suggests that this Court should issue a notice to other

exotic dancers so that they may attempt to intervene in this case *before* the Court decides Defendants' pending motion. *See id.* at 2. The Court believes that Plaintiffs' counsel's position is inconsistent with *Ragone*, which also appears to have involved a form employment contract. *See* 595 F.3d at 118. Neither the *Ragone* district court, *see Ragone v. Atlantic Video at Manhattan Center*, No. 07cv6084 (JGK), 2008 WL 4058480 (S.D.N.Y. Aug. 29, 2008), nor the Second Circuit indicated that before deciding whether particular provisions in a form contract are or are not enforceable, every other person with an interest in the enforceability of those provisions must be given an opportunity to intervene and receive the benefit of a binding concession from the defendant. Furthermore, there is no basis for Plaintiffs' suggestion that the Court should send a notice to "class members" to allow them to "opt into the case." Mot. for Clarification [doc. # 53] at 2. In the section below, the Court concludes that the collective and class action waiver provision of the Lease is valid and enforceable. Thus, there are no missing "class members," *id.*, and other exotic dancers who signed the Lease do not have any right to "opt into" this case. *Id.*

That said, the Court's decision here is in the public record, and the Court believes that it has strongly indicated that it is *only* enforcing the arbitration clause in the Lease because of Defendants' concession. Plaintiffs' counsel is free to share the Court's decision with other exotic dancers who may wish to bring claims against Defendants, and is free to cite this Court's decision in other cases before this Court or before other district court judges. Plaintiffs' counsel is free to cite the Second Circuit's strong language in *Ragone* in any other cases she files against Defendants, although she neglected to do so in her briefs in this case. The Court hopes that in light of this decision, Defendants will agree to the same concession they eventually made in this case, even though they may not by bound to do so. The Court hopes that Defendant will not put

either cost- and fee-shifting provisions or statute of limitations shortening provisions into their contracts in the future.

### d.

This Court has some doubt about *American Express II* in light of *AT&T Mobility*, but again, the Court remains obligated to apply *American Express II*. The rule set forth by the Second Circuit in *American Express II* is that "a party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." *American Express II*, 634 F.3d at 197 (quoting *Green Tree Financial*, 531 U.S. at 92). "[E]ach case which presents a question of the enforceability of a class action waiver [or other provision] in an arbitration agreement must be considered on its own merits, governed with a healthy regard for the fact that the FAA 'is a congressional declaration of a liberal federal policy favoring arbitration agreements.'" *Id.* at 199 (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)).

As this Court reads *American Express II*, the decision requires this Court to inquire into whether it is economically feasible for Plaintiffs to proceed in individual arbitrations, rather than a collective or class action in federal court, given all of the procedural features that are specified in the arbitration clause in the Lease. *See* 634 F.3d at 199. In *American Express II*, "the record demonstrate[d] that the size of any potential recovery by an individual plaintiff w[ould] be too small to justify the expense of bringing an individual action." *Id.* The plaintiffs in *American Express II* submitted a detailed affidavit from an economist about the potential cost of proving their case – including expert fees – and the amount of potential recoveries. *See id.* at 197-98. The plaintiffs' out-of-pocket costs including expert fees would have been at least several hundred

thousand dollars, and possibility over $1 million. *See id.* at 198. The fee-shifting provisions of the federal antitrust laws would permit the plaintiffs to recover no more than a $40 a day for expert fees. *See id.* And even assuming that the plaintiffs prevailed and were ultimately awarded treble damages, the average plaintiff's damage award would be only $5,252, and the largest individual plaintiff's damage award would be only $38,549. *See id.* Under those circumstances, the Second Circuit reasoned that no rational plaintiff would have agreed to arbitrate an individual antitrust claim against the defendant. *See id.*

In addition to *American Express II*, Plaintiffs rely on a recent district court decision from within the Second Circuit invaliding an arbitration agreement under the *American Express II* rule. *See Sutherland v. Ernst & Young, LLP*, --- F. Supp. 2d ----, 2011 WL 838900 (S.D.N.Y. 2011). In *Sutherland v. Ernst & Young, LLP*, the plaintiff's potential damages were approximately $4,000. *See id.* at *4. The defendant did not dispute that the cost of arbitration would likely exceed $6,000 and that the plaintiff's attorney's fees would likely exceed $160,000. *See id.* The plaintiff planned to use an expert witness who charged a $25,000 retainer and whose total fees would likely exceed $33,500. *See id.* Under the arbitration agreement between the plaintiff and the defendant, the arbitrator had discretion to decide whether or not to award fees and costs, and discretion to determine a reasonable amount of fees and costs. *See id.* at *5-*6.

By contrast to the plaintiffs in *American Express II* and *Sutherland*, Plaintiffs here have not shown any likelihood that they will incur prohibitively high costs if this Court enforces the arbitration clause, including the provision banning collective or class actions. *See, e.g.*, *Pomposi v. Gamestop, Inc.*, No. 3:09cv340 (VLB), 2010 WL 147196, at *8 (D. Conn. Jan. 11, 2010). As to the size of Plaintiffs' potential recovery, Plaintiffs' counsel pleaded ignorance both in the briefing and at oral argument about the precise amounts that Ms. D'Antuono and Ms. Vilnit seek

to recover, but did concede at oral argument that Ms. D'Antuono and Ms. Vilnit each seek at least $10,000 in unpaid wages under the FLSA. That number may be low; Defendants calculate that Ms. D'Antuono and Ms. Vilnit seek significantly more than $10,000 each, perhaps as much as $30,000 each. *See* Defs.' Reply [doc. # 38] at 18. Because the FLSA provides for the recovery of double damages, *see* 29 U.S.C. § 216(b), each Plaintiff therefore seeks to recover at least $20,000 on her FLSA claim alone.

Plaintiffs argue that they may not recover the full amount they seek, particularly if Defendants are able to prevail on possible counterclaims against Plaintiffs to recover fees paid directly to Plaintiffs by the Clubs' clients. But the *American Express II* test requires this Court to look into Plaintiffs "potential recovery," 634 F.3d at 199, which the Court believes means their potential recovery *assuming that they* win, rather than assuming that they lose. Presumably, Plaintiffs and their counsel believe that Defendants' counterclaims are meritless – otherwise, it would irrational for them to bring an action either in court or before an arbitrator, as the amount of Defendants' potential counterclaims may be much greater than the amount of damages Plaintiffs seek to recover. In addition, unlike in *Sullivan*, *see* 2011 WL 838900, at *5-*6, the arbitration clause in the Lease explicitly permits Plaintiffs to recover their costs and attorney fees if they prevail. Thus, the Lease provides Plaintiffs with the same rights to recover costs and fees that they would have in this Court. *See* 29 U.S.C. § 216(b) (providing that in an FLSA action, the court "shall" award reasonable attorney fees and costs to any prevailing plaintiff).

As to the expense of bringing individual arbitration actions, Plaintiffs initially submitted various declarations and materials regarding the cost arbitration before the AAA, suggesting that the cost of an individual arbitration could approach $60,000. *See* Tab 2 to Churchill Decl. [doc. # 26-1] at 2; Tab 1 to Liss-Riordan Decl. [doc. # 26-6]. But in their briefs and at oral

argument, Defendants conceded that because this case involves employment-related claims, the AAA Employment Rules will apply. *See* Defs.' Reply [doc. # 38] at 14. Under the AAA Employment Rules, Defendants must bear the costs of arbitration above an initial $175 filing fee. *See* Tab 1 to Genna Decl. [doc. # 39-7]; *see also Cooper v. MRM Investment Co.*, 367 F.3d 493, 513 (6th Cir. 2004) ("The AAA has . . . amended its rules . . . to hold employers responsible in the first instance for all expenses except a small filing fee and costs for the employee's witnesses. This may make it more difficult for Cooper to show [that] her likely arbitration costs are prohibitively high . . . ."). In addition, because Plaintiffs do not intend to retain any expert witnesses, *see* Report of 26(f) Planning Meeting [doc. # 24] at 5, one of the most significant concerns that motivated the Second Circuit's decision in *American Express II* is simply not present in this case. *See* 634 F.3d at 198.

Thus, it appears that each Plaintiff's potential recovery is at least $20,000 – including double damages under the FLSA – *plus* costs and attorney fees, and that each Plaintiff's total out-of-pocket costs will be only a $175 filing fee plus attorney fees. Defendants have also conceded that they will not seek to recover fees and costs from Mr. D'Antuono and Ms. Vilnit in the event that Defendants prevail before an arbitrator. *See* Notice [doc. # 52]. Those facts alone are sufficient to distinguish this case from *American Express II*, where the potential individual recovery was dwarfed by the astronomical cost of litigating a complicated antitrust action. *See* 634 F.3d at 198-99. Under the circumstances presented here, there is no reason why a rational attorney would be unwilling to represent either Plaintiff, even if Plaintiffs' current counsel is not willing to continue to represent them. *See AT&T Mobility*, 131 S. Ct. at 1753; *Sutherland*, 2011 WL 838900, at *6. It is true that Plaintiffs may not prevail before the arbitrator, and that Plaintiffs must take that possibility into account in evaluating the potential cost of litigation. *See*

*American Express*, 554 F.3d at 318. But no plaintiff can ever be certain of victory, either in court or in arbitration. In all litigation, plaintiffs and their attorneys always take on a risk of spending money on litigation that they may eventually be unable to recover from any defendants. Even plaintiffs who are successful and win judgments may never be able to enforce them if the defendants later turn out to be insolvent. Individual plaintiffs do undertake individual actions in this Court, including FLSA actions, *see, e.g.*, *Medina v. Unlimited Sytems, LLC*, --- F. Supp. 2d ----, 2010 WL 5253530, at *1 (D. Conn. 2010), in spite of those many obstacles.

## V.

In sum, the Court concludes that there is no genuine dispute that Ms. D'Antuono and Ms. Vilnit agreed to arbitration and that Ms. Cruz did not; that the arbitration agreement in the Lease is neither substantively nor procedurally unconscionable under Connecticut law; and that in light of Defendants' concessions regarding certain provisions in the arbitration agreement and the amount of damages that Ms. D'Antuono and Ms. Vilnit seek individually, Plaintiffs cannot carry their burden under *American Express II* of showing a likelihood that requiring arbitration will deprive them of any opportunity to vindicate their federal statutory rights. *See* 634 F.3d at 197. For those reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss and/or Stay this Action; to Compel Arbitration; and to Strike Class and Collective Action Allegations [doc. # 12]. The Court DENIES that motion in full with regard to Ms. Cruz's claims. The Court GRANTS that motion in part with regard to Ms. D'Antuono's and Ms. Vilnit's claims. Specifically, the Court STRIKES Ms. D'Antuono's and Ms. Vilnit's class and collective action allegations, and STAYS consideration of Ms. D'Antuono's and Ms. Vilnit's claims. *See* *Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002).

As a result of the Court's decision, Plaintiffs' Motion for Clarification [doc. # 53] is DENIED as moot. That said, the Court has not dismissed Ms. Cruz's claim and has stayed, rather than dismissed, Ms. D'Antuono's and Ms. Vilnit's claims. This case will thus remain pending on the Court's docket. If other plaintiffs file complaints against the same Defendants in the District of Connecticut, and those plaintiffs raise substantially the same issues that are raised in this case, those plaintiffs make seek to have their complaints considered by this Court, rather than by a different judge, in the interests of justice and convenience, and also to avoid conflicting results.

## VI.

After the Court filed its original Memorandum of Decision regarding the motion to compel arbitration on May 25, 2011, Plaintiffs filed a Motion to Certify Order for Interlocutory Appeal [doc. # 58]. The Court has now granted that motion, and the Court now amends this Memorandum of Decision accordingly to certify an appeal pursuant to 28 U.S.C. § 1292(b).

Section 1292(b) provides, in pertinent part, as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). If the district court makes such a certification and if timely application is made to the Court of Appeals, that court may, in its discretion, permit an immediate appeal to be taken. *Id.* Certification under § 1292(b) should be granted sparingly because it undermines the policy against piecemeal appeals. *See Lora v. O'Heaney*, 602 F.3d 106, 112 (2d Cir. 2010); *Doninger v. Niefhoff*, No. 3:07cv1129 (MRK), 2009 WL 1364890, at *2 (D. Conn. May 14, 2009). To certify an order for interlocutory appeal, the order must satisfy three criteria: (1) it must involve a "controlling question of law"; (2) "as to which there is substantial ground for

difference of opinion"; and (3) "an immediate appeal may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see, e.g.*, *Casey v. Long Island Railroad Co.*, 406 F.3d 142, 146 (2d Cir. 2005). While the Court has some lingering doubts about the wisdom of allowing an appeal at this time, the Court nonetheless concludes that all three criteria are satisfied regarding the present order.

First, the Court is persuaded that the order involves several different controlling questions of law. This Court has based its decision on the Second Circuit's decision *American Express II* 634 F.3d 187, the Second Circuit's decision in *Ragone*, 595 F.3d 115, and on other Second Circuit cases involving the federal common law of arbitrability. But the nature of the arbitration agreement at issue in this particular case – which combines several different potentially problematic features that the Second Circuit has previously had occasions to consider in isolation, but never all together – means that the controlling and purely legal question of whether that arbitration agreement is enforceable based on existing Second Circuit precedent is a novel one. In addition, as the Court has already discussed at length, after the United States Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, there is now a great deal of uncertainty surrounding the continuing validity of the federal common law of arbitrability doctrines on which Plaintiffs rely. *See, e.g.*, *id.* at 1747 (noting with disapproval that "judicial hostility toward arbitration" has "manifested itself in 'a great variety' of 'devices and formulas' declaring arbitration against public policy" (citation omitted)). The continuing validity of those doctrines, and of *American Express II*, 634 F.3d 187, and *Ragone*, 595 F.3d 115, are also controlling questions of law.

Second, the Court is also persuaded that there is substantial ground for difference of opinion regarding those several controlling issues of law. The Second Circuit has never had

occasion to consider how a district court should analyze an arbitration agreement presenting a combination of the particular features present in the arbitration agreements at issue in *American Express II*, 634 F.3d 187, and in *Ragone*, 595 F.3d 115. When an arbitration agreement includes a class waiver provision in addition to a cost- and fee-shifting provision and a provision altering the otherwise applicable statute of limitations, a party's willingness to waive some – but not all – of the potentially offending features may not be sufficient to save the arbitration agreement. As the Court has tried to emphasize, the enforceability of arbitration agreements is a highly contentious and – currently – constantly evolving area of law. in light of that fact, the Court has no doubt at all that reasonable jurists might well disagree with this Court's analysis of the controlling legal issues and its ultimate legal conclusions regarding the enforceability of the arbitration agreement at issue in this case.

Third, the Court is also persuaded that permitting an interlocutory appeal from this order may well materially advance this litigation. The Court has found this third prong to be the most difficult one in past cases, *see Doninger*, 2009 WL 1364890, at *3, and this case is no different. Permitting an appeal now will of course delay the arbitration. But the Court's order requires two of the three named Plaintiffs to arbitrate their claims against Defendants, and thus splits this case into two different tracks – one track in federal court, and the other in arbitration – presenting virtually identical issues. There is some possibility, albeit a remote one, that the Second Circuit may ultimately resolve this case in a manner that places all three Plaintiffs back onto the same track. Because a ruling from the Second Circuit may ensure that there is only one proceeding in one forum, rather than two proceedings in two different fora, the Court concludes that an interlocutory appeal could materially advance this litigation. *See id.*

Accordingly, the Court certifies the following questions to the Second Circuit:

(1) Are *American Express II* and *Ragone* still good law, in light of the United States Supreme Court's most recent interpretation of 9 U.S.C. § 2 in *AT&T Mobility*? *See* 131 S. Ct. at 1746 (reasoning that 9 U.S.C. § 2 does not authorize federal courts to invalidate arbitration agreements based on "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue").

(2) Under the federal common law of arbitrability, as set forth in *American Express II* and *Ragone*, and in light of the United States Supreme Court's most recent interpretation of 9 U.S.C. § 2 in *AT&T Mobility*, are district courts permitted to inquire into general public policy concerns in determining whether a particular arbitration agreement is enforceable, or must they instead only look to the economic feasibility of arbitration under the circumstances?

(3) Under *American Express II* and *Ragone*, and in light of the United States Supreme Court's most recent interpretation of 9 U.S.C. § 2 in *AT&T Mobility*, is an arbitration agreement that contains a class action waiver provision, a cost- and fee- waiver provision, and a provision requiring all arbitration claims to be filed within six months after the termination of the contractual relationship, enforceable when the party seeking to enforce the agreement waives enforcement of the cost- and fee-waiver provision and the six-month filing provision, but not the class action waiver provision?

The Court understands that by certifying these three questions, the Court's entire order is certified, not just the three questions presented above. *See United States v. Stanley*, 483 U.S. 669, 676-77 (1987) (explaining that 28 U.S.C. § 1292(b) "brings the 'order,' not the question, before the [appellate] court"); *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 391-92 (2d Cir. 2008) ("When a district court certifies, pursuant to 28 U.S .C. § 1292(b), a question of

controlling law, the entire order is certified and we may assume jurisdiction over the entire order, not merely over the question as framed by the district court."). Plaintiffs must file their Petition for Permission to Appeal with the Clerk of the Second Circuit within ten days of this Amended Memorandum of Decision. *See* 28 U.S.C. § 1292(b); Fed. R. App. P. 5(b). If a timely application is made to the Second Circuit, the Second Circuit may in its discretion permit an interlocutory appeal from this order to be taken. *See Doninger*, 2009 WL 1364890, at *1.

IT IS SO ORDERED.

/s/ _____ Mark R. Kravitz _____
United States District Judge

**Dated at New Haven, Connecticut: June 7, 2011.**