AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| DINA NICOLE D'ANTUONO, | : | |
| Claimant, | : | |
| | : | |
| v. | : | AAA No. 11-160-02069-11 |
| | : | |
| C&G OF GROTON, ET AL., | : | |
| Respondents. | : | |

and

| | | |
|---|---|---|
| KAREN VILNIT, | : | |
| Claimant, | : | |
| | : | |
| v. | : | AAA No. 11-160-02089-11 |
| | : | |
| C&G OF GROTON, ET AL., | : | |
| Respondents. | : | |

## ARBITRATOR'S INTERIM AWARD

I.     Findings of Fact

Based on the credible testimony, the exhibits and the entire record developed during the

hearings on January 29 and 30, 2013, I find the following facts established.

(a)     Factual Background[1]

Claimants Dina Nicole D'Antuono and Karen Vilnit worked as exotic dancers at the Gold

Club, a strip club.  Claimant D'Antuono worked at the Club from December 2007 until February

2010.  Claimant Vilnit worked at the Club from December 2007 until January 2010.  During the

---

[1] The Claimants are also referred to as "entertainers," "performers" and "dancers."  The Respondents are referred to as "Gold Club," "Club" and "employer."

time they worked at the Club, they were described as lessees or tenants.  At the request of the Respondents, on November 4, 2008, D'Antuono signed an Entertainment Lease, although she did not, by her own choice, read the Lease.  On September 17, 2008, Vilnit also signed the Lease, and read it briefly before signing.

As described in the Lease, its purpose was to permit D'Antuono and Vilnit to "lease from the club, jointly together with other similar entertainers and upon terms contained in this Lease, the right to use certain areas of the premises for activities related to the presentation of live semi-nude and/or nude dance entertainment to the adult public."  Under the Lease, both women had the right to use the stage and other portions of the Club premises to perform as entertainers. Under the Lease, the Club was obligated to provide, at its expense, music, lighting and dressing rooms and to pay copyright fees due for using the dance music and to advertise the business in a commercially reasonable manner.

The Club advertises its business through a website, which features pictures and videos of the dancers.  The videos show various dancers performing in provocative poses and in nude or semi-nude positions and wrapping themselves around poles.

The Lease provides that the Club is "an adult entertainment establishment" where dancers will be "tenants" subject to "partial and/or full nudity (primarily female) and explicit language," as well as to "advances by customers, to depictions or portrayals of explicit sexual conduct, and to similar types of behavior."  Under the Lease, the dancers agree to perform "semi-nude (topless) and/or nude dance entertainment" at the Club.  In doing this work, dancers agree to "perform consistent with the industry standards of a professional exotic dancer."  The Lease also provides that there will be set fees (called "entertainment fees") for certain performances, "such as couch and table dances," and that dancers "may not charge more than the set fees."  These are

43779964.5

mandatory fees set by the Club.  The Lease explicitly states the dancers will not be paid any wages.

The Lease further provides at length that dancers are not employees.  Under the Lease the dancers acknowledge that their right to be paid entertainment fees is contingent on them working as tenants or lessees instead of as employees.  The Lease also provides that if they were employees, they would not receive more than the lowest legal wage.  The Lease goes on to say that if the dancers were employees, the Club would have the right to fire them at any time without cause and to control their physical appearance and makeup, costumes and wearing apparel, their work habits, their customers and their performances.

The Lease also tells dancers that if they claim to be employees, they will forfeit all of the entertainment fees they previously earned.  It also provides that, should the dancers claim to be employees, they will be liable for any attorneys' fees, costs, or other damages incurred by the Club as a result of that claim.

Before the Club would allow a dancer to perform at its facility, she had to audition on stage for one or more managers.  Commencing in 2008, before a dancer was allowed to perform inside the Club, she was required to sign an Entertainment Lease, provide a copy of her identification, and complete an application form.

The Lease states that the Club has the right to impose such rules on the use of the premises by the entertainer as the Club deems necessary to ensure no damage to the Club's property occurs, that the Club premises are used in a safe fashion to benefit all entertainers, patrons and others, and that the dancer must not violate any law.  Although the Lease is for a one-year duration, it may be terminated at any time, either by the Club or the dancer without cause or explanation.

-3-

The Club decides what hours it will be open for business and provides a schedule for performances. The dancers are then free to choose on a central calendar when they are going to perform. If a dancer fails to appear when scheduled, she is required to pay the Club a penalty. Before her performances, the dancer goes to the Club's dressing room to change, reports in to the DJ, and then starts working. The Club has designated areas where the dancers may perform. At the end of the shift, the dancer reports to the DJ that she is leaving, pays a required tip to the DJ and then changes in the dressing room.

There are four principal ways that a dancer can perform. First, she can perform a "stage set." The dancer's only income for a stage set is the tips the customers choose to give her. Customers wishing to enter the Club and view the adult dancing and entertainment must pay the Club a cover charge. While watching the dancers, customers are encouraged to purchase alcohol. Next, the dancer may perform a "private dance," also known as a "booth dance." The Club sets mandatory entertainment fees which the customers must pay for private dances. For example, the Club sets the fee that a customer pays for a "booth dance," which in this case was $25. Of that amount, the dancer keeps $20 and pays $5 to the Club. The Club establishes the duration of each dance, which is usually three to five minutes depending on the length of the song to which she is dancing. The customer is free to tip the dancer in addition to paying the fixed fee for the dance.

The dancers can also perform in a "VIP" area. The fee for that performance is $100 for 15 minutes, $200 for 30 minutes and $300 for an hour. The entire fee goes to the Club. Customers pay the dancers in cash, by credit or with script often referred to as "funny money." The customer is free to tip the dancer.

-4-

Dancers can also perform in the "Champagne Room," for which the customer is charged a fee of $110 for one-half hour. The entire amount goes to the Club. Again, the customer is free to tip the dancer. At the end of her shift, the dancer must pay "rent" to the Club in the amount of $20 and a tip to the DJ. The Club does not regard the dancers as employees and, therefore, does not pay them "wages." The Club does not keep a record of the tips the dancers take home or the dancer's share of the private dance fees.

The Club uses various forms to record each dancer's performances. The floor manager observes the dancers when they are performing a booth dance and the floor manager tracks how many dances the dancers have performed. The manager then gives the dancer a receipt showing how much the dancer must pay over to the Club. The dancer is then supposed to go to the Club's cashier to turn over the receipt and pay the amount owed to the Club. The Club also uses a form to track which dancers work each shift, including their arrival and departure times. Lastly, the Club maintains a file for each dancer, and that file includes a copy of the dancer's release, a copy of her identification, and a copy of her application.

  (b)  <u>Gold Club's Failure to Keep Records of Claimants' Earnings and Hours Worked</u>

Under both federal and state law, Gold Club was required to keep earnings records. *See* 29 C.F.R. §§ 516.2, 516.6, requiring collection and retention of earning records and Conn. Gen. Stat. § 31-66, requiring an employer to keep at the place of employment for a period of three years a true and accurate record of the hours worked by and the wages paid by him to each employee, unless exempted by regulation issued by the Commissioner. At the hearing, Gold Club failed to provide any records showing that it had complied with state and federal law. Based on that failure, the Club is not entitled to set-off amounts retained by the dancers. *See Ruffin v. Entm't of E. Panhandle*, No. 3:11-CV-19, 2012 WL 1435674, (N.D. W.Va. Apr. 25,

2012), where the court found that even if the club in that case was entitled to pursue a set-off theory, it could not do so where it lacked records of the amounts retained by the dancers.

Although Gold Club uses various forms to record the work performed by dancers, the Club does not have any records showing how much Claimants made or how much of their compensation came from funny money transactions. The Club's floor hosts" observe the dancers while they are performing booth dances. The floor host then gives the dancer a "receipt" showing how much she must pay over to the Club. The dancer, in turn, is supposed to go to the Club's cashier, turn over the receipt, and pay the amount owed to the Club. In addition to using these receipts, the Lease and the application form, the Gold Club uses other forms in connection with the work performed by the dancers. It uses forms to track "funny money" earned by the dancers; a form to track booth dances performed by dancers; and a form to track which dancers worked each shift, including their arrival and departure times. Gold Club did not retain any of these forms for the periods during which Vilnit or D'Antuono worked at the Club. Therefore, it did not present as evidence records regarding the money that each Claimant took home after each shift.

Although the Club apparently has daily reports showing cash and credit card receipts for the years 2007 through 2010, it did not present those reports at the arbitration, nor did it present any documents such as receipts for keeping records of tax returns showing the amount of funny money revenue.

      (c)     <u>The Lease</u>

            (i)     <u>Terms</u>

Under the Lease, the parties explicitly acknowledge that their relationship is that of "landlord" and "tenant," and specifically disavow an employment relationship between them.

*See* Paragraph 12A.  The Lease provides that the Claimants, as entertainers, will not be paid an "hourly wage" or "overtime pay."  *See* Paragraph 12A.  The Lease also states that the Respondent Club will not provide the entertainers with any employee benefits, any workers' compensation benefits or any unemployment insurance benefits.

The Lease provides that, in addition to the tips they may receive from the customers of the Club, the dancers may be paid entertainment fees, which are fees fixed by the Club for certain performances or dances, such as couch and table dances.  The entertainers are prohibited from charging the customer more than the fixed fees.

The Lease also states that the entertainer commits a material breach of the Lease if she claims that her business relationship with the Club is other than that of landlord and tenant.  Under the Lease, if the relationship between the Club and the dancers is found by a court, tribunal or an arbitrator to be not a relationship of landlord and tenant, but instead, an employer/employee relationship, the entertainers must "surrender, reimburse and pay to the **Club**, all **Entertainment Fees** earned by **Entertainer** at any time while performing on the [Club's] **Premises**." Paragraph 12C(i) (emphasis added).  If the entertainers fail to repay the Club all of these fees, the fees received from the customers would be considered wages paid by the Club.  Paragraph 12C(i) of the Lease provides that any entertainment fees not returned by the entertainer Claimants to the Club are to be considered  in such circumstances to have been wage payments from the Club to the entertainer.

The Lease also provides that in such event, the entertainers will be liable for attorneys' fees and other damages incurred by the Club as a result of any claim of an employer/employee relationship.

-7-

In addition, if a dispute arises between the parties, the Lease requires arbitration of any claims from the entertainer's work at the Club. If the entertainers lose the arbitration, they may be liable for the Club's arbitration costs and attorneys' fees. To prevent the entertainers from joining together in a class action, the Lease prohibits them from consolidating or seeking class treatment for any claims. Lastly, the Lease provides a six-month statute of limitations. The foregoing arbitration provision survives the termination provision in the Lease.

(ii)     Duration

Claimant D'Antuono began working at the Club in December 2007 and left in February 2010. The Lease she signed provides in Paragraph 1 that "This Lease begins today, and ends on the earlier of: (A) One year from today's date; (B) A termination date as provided for in paragraph 18."

This Lease does not contain an evergreen provision.

Claimant Vilnit also began working at the Club in December 2007 but quit her employment in December 2009 or January 2010. Her Lease contained the same provision set forth above regarding the duration of the Lease.

II.     Claimants

(a)     Dina D'Antuono

The Claimant, Dina Nicole D'Antuono ("D'Antuono"), graduated from high school in 2003, and she can read, write and understand the English language. She began working at the Respondent Gold Club ("Club") on December 3, 2007 as an exotic dancer and worked there through February 26, 2010, missing approximately two weeks of work during the entire period. She was 23 years old when she began at the Club. D'Antuono typically performed at the Club

-8-

on Monday, Wednesday and Friday from 12 noon to 7 pm, approximately 21 hours per week. During her entire tenure at the Club, she worked approximately 2,394 hours.

The Club did not pay D'Antuono an hourly wage. Instead, the Club permitted her to share a substantial portion of the fixed fees the Club charged customers for certain kinds of private dances. In addition, she earned tips or gratuities from the customers. While she worked there, she always earned substantially more than the minimum wage.

At the end of each shift, D'Antuono had to pay the Club a shift fee or "rent" of $20, resulting in shift fees of $60 per week she paid. Over the course of her tenure with the Club, she paid the Club shift fees of approximately $6,840.

In addition to the shift fees, the Club required D'Antuono to pay a tip-out fee to the DJ of at least $10 per shift. The Club's DJ managed the dancers by keeping track of the rent payments, reminding the dancers to pay their rent, calling the dancers who were late or absent, or steering dancers to particular customers. The DJ also helped to manage customer complaints. Over the course of her employment, D'Antuono tipped out the DJ a total of about $3,420. Approximately 80% of the time, D'Antuono performed fixed fee dances. The customers paid her in cash.

The Club did not provide D'Antuono any records of her earnings, nor did she keep any records of her earnings. Approximately one year after she started working at the Club, D'Antuono was called to the Club's office, where the Club's manager, Miranda Bergeron, told D'Antuono that she had papers that D'Antuono needed to sign. Bergeron then presented her with an Entertainment Lease (the "Lease"). When D'Antuono asked what it was, Bergeron told her "This is something for you to sign. We are just updating our files."

D'Antuono did not read the Lease. No one prevented her from reading the Lease. Bergeron did not tell D'Antuono that the Lease was changing her relationship with the Club, or

43779964.5

that it was an important document, nor did she encourage D'Antuono to read the Lease. Bergeron did not give D'Antuono a copy of the Lease to take home.  After D'Antuono signed the Lease, nothing changed in terms of the Club's pay practices.  The pay practices remained the same throughout the entire time she worked at the Club.  Nothing prevented D'Antuono from reading the Lease before signing it or asking for a copy to take home and review.  During the entire time she performed at the Club, she never asked to be treated as an employee or even claimed she was an employee.

Before going to work for the Club, D'Antuono had worked a brief stint at a strip club in Las Vegas, where she was classified as an employee and did work for minimum wages plus tips. She testified that she made about the same amount there as she did at the Gold Club.

(b)   <u>Karen Vilnit</u>

The Claimant, Karen Vilnit ("Vilnit"), began working as an exotic dancer at the Gold Club ("Club") on December 11, 2007 and continued working at the Club until December 2009 or January 2010.  She worked for the Club for approximately 112 weeks, through January 29, 2010. While she worked there, she was not paid any wages.  Instead, the Club permitted her to keep a substantial portion of each fixed fee the Club charged customers for certain kinds of dances.  In addition, she earned tips or gratuities from the customers.  While she worked there she always earned substantially more than the minimum wage.

During her first year at the Club, Vilnit typically performed on Monday, Wednesday and Friday from 12 pm to 7-8 pm, or approximately 22.5 hours per week.  Once or twice per month, she picked up an extra shift.  In her second year, she typically worked four shifts per week, or about 30 hours per week.  As a result, she worked a total of about 2,940 hours for the Club.

-10-

For each of the shifts she worked during a typical week, Vilnit paid the Club a shift fee of $20, resulting in weekly shift fees of $60 to $80.  Throughout her employment, Vilnit paid the Club shift fees of approximately $7,840.  Ninety percent of the private dances she performed on a fixed fee basis for the customers were paid for in cash.  Vilnit made most of her money through these private dances, and she estimates that 90% of her income came from those dances.

During her first year at the Club, Vilnit brought home approximately $700 to $1,500 per week, with an average of about $1,000 per week.  During the first year she earned an average of $500 - $600 per shift.  During her second year, the amount she earned each shift went down, and in the last six months she averaged only $200 to $300 per week, and sometimes considerably less.  Combining the two years she worked there, she took home an average of $300 per shift.

The amount Vilnit paid to the Club for private dances was approximately 25% of her take-home pay.  Each week, Vilnit paid about $225 in private dance fees, ie., $75 per shift times 3.5 shifts per week.  Over the course of her employment, Vilnit paid the Club private dance fees of approximately $8,400.  After each shift, Vilnit was required to pay the DJ a minimum of $10 for each shift, and over the course of her employment she tipped out the DJ a total of about $3,920 from her tips.  The Gold Club did not give Vilnit any records regarding her work, including records of her earnings or records of the fees she paid.

About halfway through her tenure at the Club, the manager, Ms. Bergeron, called Vilnit in to the office during the middle of her shift and presented her with a Lease that the Club asked her to sign.  Bergeron told Vilnit she needed to have the Lease signed, without any explanation of what the Lease was.  Vilnit is able to read, write and understand the English language.  No one prevented her from reading the Lease.  Vilnit signed the Lease on September 17, 2008.  Vilnit has no recollection of the Club giving her a copy of the Lease.

-11-

The financial terms of the Club's relationship with Vilnit were the same before, during and after the Lease was in effect.

III.   Conclusions of Law

    (a)   The Lease Is An Illegal Contract Under Connecticut Law And Is, Therefore, Unenforceable.

In his December 3, 2012 ruling on summary judgment, this Arbitrator found that the Claimants were employees of the Club and were, therefore, entitled to the protections and benefits provided to employees by state and federal laws.

Under Connecticut law, employers must pay employees at least the minimum wage. Conn. Gen. Stat. § 31-60(a) and (b).  The Lease signed by the Claimants states in Paragraphs 12 that the Club does not pay hourly wages or overtime pay to its dancers and, therefore, on its face, violates the minimum wage law.

Paragraph 15 of the Lease also provides Claimants must pay the Club a shift fee or "rent" after each set or shift at which they perform.  The Club also requires the dancers to tip out the DJ.  The dancers are also required to pay to the Club a portion of the dance fees they receive from the Club's patrons.  This Lease requirement is illegal under Connecticut law because it violates Conn. Gen. Stat. § 31-73, *Refund of Wages For Furnishing Employment*, which provides as follows:

> (a) When used in this section, "refund of wages" means:  (1) The return by an employee to his employer or to any agent of his employer of any sum of money actually paid or owed to the employee in return for services performed . . .

> (b) No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment.  No such person shall require, request or demand that any person

-12-

agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment.

To retain and continue their employment with the Club, Claimants were required to sign the Lease and to pay the Club rent and DJ fees out of their earnings and gratuities. In short, they were required to pay back to the Club "a sum of money actually paid," in violation of Conn. Gen. Stat. § 31-73.

Respondents argue that Connecticut law allows employers and employees significant latitude to enter into wage agreements. They argue that as long as Claimants voluntarily signed the Lease and did not challenge their classification as lessees or tenants, Claimants could keep most what they earned from the private dances. In other words, what dance fees they received, were unvested compensation, subject to defeasance if the dancers attempted to exercise their rights and challenged their classification before the Department of Labor, a court, tribunal or an arbitrator.

While it is true, as the Respondents assert, that Connecticut case law allows employers and employees wide latitude to enter into wage agreements, that latitude does not extend to permitting the parties, by contract or otherwise, to override or vitiate the requirements of Connecticut law. Here, the Lease does just that. It is not simply a contract specifying how wages should be calculated or the amount of wages to be paid. Instead, it is an agreement that requires a dancer to repay the Club "all" fees she earned as a dancer if she challenges her classification and succeeds in showing she was an employee entitled to wages and the protections and benefits provided to employees under Connecticut law. As written, the Lease violates Conn. Gen. Stat. §§ 31-60(a) and 31-73.

43779964.5

The issue here is not what the parties agreed to in the Lease – that does not seem to be in dispute.  The issue is this – is what they agreed to lawful and enforceable?  *See Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 142-44 (2d Cir. 2008).

Here, Paragraph 12C of the Lease, "<u>Business Relationship of Parties</u>," set forth below requires that an employee who exercises her right to challenge her misclassification as a tenant or lessee must repay "all" of the entertainment fees she earned previously at any time while performing on the Club's premises.

C.  If any court, tribunal, arbitrator, or governmental agency determines that the relationship between the parties is something other than that of landlord/tenant and that **Entertainer** is then entitled to the payment of wages from the **Club**, all of the following shall apply:

i.   In order to assure that the **Club** is not unjustly harmed and that **Entertainer** is not unjustly enriched by the parties having financially operated pursuant to the terms of this **Lease**, the **Club** and **Entertainer** agree that **Entertainer** shall surrender, reimburse and pay to the **Club**, <u>all</u> **Entertainment Fees** earned by **Entertainer** at any time while performing on the **Premises**; all of which would otherwise have been received and kept by the **Club** had they not been retained by **Entertainer** under the terms of this **Lease**.  Any **Entertainment Fees** not returned by **Entertainer** to the **Club** shall be considered in the circumstances to have been wage payments from the **Club** to the **Entertainer**; and

ii.  The relationship of the parties shall immediately convert to an arrangement of employer and employee upon the terms as set forth in subparagraph 12B.

Paragraph 12 C (emphasis added).

Prior to the challenge and before they signed their Entertainment Leases, the Claimants were earning more than the minimum wage.  Yet, the text of Paragraph 12C requires that if they challenge their misclassification and prevail on their challenge, they are obligated by 12C to

-14-

return "all" entertainment fees and work for minimum wage only.[2] *See* Paragraph 12B, which provides: "In addition, under such an employment relationship **Entertainer** would be paid on an hourly basis at a rate equal to the applicable minimum wage, reduced by the maximum of any 'tip credit' that may be allowed by law."

Paragraph 12C is clearly designed to penalize a dancer for challenging her classification by requiring that she repay "all" the entertainment fees she earned previously at the Club.[3] Further, Paragraph 7, "Nature of Performances – Property Rights," provides that the Entertainer shall own all intellectual property rights of her entertainment performances, including copyrights and rights of publicity. However, if she challenges her classification and the relationship is ever changed to that of employee, these intellectual property rights become the property of the Club.

Further, Paragraph 12B provides that if the relationship of the Entertainer and the Club becomes that of employer and employee, the Club will take control of her ability and freedom to perform her entertainment activities at other locations and at other businesses.

Paragraph 17G, "Material Breach by Entertainer," provides that the Entertainer materially breaches the Lease simply by claiming that her business relationship with the Club is something other than landlord and tenant, contrary to Paragraph 12A of the Lease. In the event of such a breach, Paragraph 18 and 18A, "Termination/Breach," provides that the Club may, at its option, hold the challenging entertainer liable for damages.

---

[2] In their arbitration briefs, Respondents claim that they are only seeking reimbursement or set-off for all the entertainment fees the Claimants earned above the applicable minimum wage.

[3] The Lease has no comparable provision requiring the Club to repay or reimburse the Entertainers for the rent they paid to the Club or the tips they were required to pay the DJs while misclassified as tenants.

-15-

As the Connecticut Appellate Court noted in *Parente v. Pirozzoli*, 87 Conn. App. 235, 246 (2005), "[a]greements that are legal on their face, yet are designed to evade statutory requirements, are routinely held unenforceable." The foregoing paragraphs are clearly designed to penalize the employee for exercising her right to insist upon proper classification. The inherent purpose of the Lease is to violate the law. For these reasons, I find that the Entertainment Lease, including Paragraph 12C, is unlawful and unenforceable.

    (b)    <u>Procedural Unconcsionability</u>

For the reasons previously articulated by Judge Kravitz in resolving the issue of procedural unconscionability as it pertained to the arbitration clause in the Lease, I find that the Lease in its entirety is not procedurally unconscionable. *See D'Antuono. v. Service Rd. Corp.,* 789 F. Supp. 2d 308, 324 and 328 n.7 (D. Conn. 2011), where the court stated "[T]here is no merit to Ms. D'Antuono's and Ms. Vilnit's argument that the Court should overlook their negligence in failing to read the Lease...." Judge Kravitz noted that the Connecticut Supreme Court has rejected the notion that provisions in a form contract are procedurally unconscionable whenever a party with greater bargaining power fails to direct the other party's attention to important provisions. While his remarks were directed to the arbitration clause, they apply with equal force to the Lease as a whole. Claimants presented no credible evidence that they were pressured, fraudulently misled, threatened, deceived or tricked into signing the Lease or that the Lease document was unreadable because of the size of the paper or the print on the pages. For their own reasons, they chose not to read the Lease before signing it and not to consult with an attorney.

(c)     Substantive Unconscionability

The doctrine of unconscionability as a defense to the enforcement of a contract generally requires a showing that the contract was both procedurally and substantively unconscionable when made.  "Substantive unconscionability" focuses on the content of the contract, as distinguished from procedural unconscionability, which focuses on the process by which the allegedly offensive terms found their way into the contract.  Since I have already found that the Lease is unlawful for the reasons discussed at pp. 11-16, there is no need to address the issue of substantive unconscionability.

(d)     Credit for Tips or Services Charges

(i)     Wage Laws

Because, in reality, the dancers were employees of the Club and not its tenants or lessees, they were entitled to the protections and benefits of state and federal laws.  As an employer, the Club was required to pay its employees at least the minimum wage.  Conn. Gen. Stat. § 31-60(a) and (b) and 29 U.S.C. § 206.  Paragraph 12A of the Entertainment Lease prepared by the Club provides that the Club will not pay the entertainers an hourly wage or overtime pay.  It is undisputed that while the Claimants worked at the Club, they never received an hourly wage, nor did the Club ever tell them it was paying them an hourly wage or that they might get overtime if they worked more than 40 hours in a work week.  To the contrary, the Lease is clear that the dancers will not receive an hourly wage or overtime pay.  *See* Paragraph 12A.

(ii)     Tip Credit

Under Connecticut and federal law, an employer can take a tip credit if it meets certain legal requirements.[4]  Tips may be counted toward wages if "[t]he amount received in gratuities

---

[4] Under Connecticut law, no employee may be paid exclusively through tips.  Conn. Agencies Regs. § 31-60-2.

-17-

claimed as credit for part of the minimum fair wage shall be recorded on a weekly basis as a separate item in the wage record, even though payment is made more frequently." Conn. Agencies Regs. § 31-60-2(a)(2). Here, the Gold Club did not record on a weekly basis the amount of gratuities received by the entertainers toward minimum wage. Therefore, it is not entitled to count any tips toward minimum wage. Since the dancers never received an hourly wage, the Club is not entitled to a tip credit.

Likewise, under federal law, the Club is not entitled to a tip credit because it never paid any wages to the Claimants. Additionally, it never informed the Claimants that it was taking a tip credit and did not allow Claimants to keep all their tips. Claimants had to pay rent to the Club at the end of each shift and also were required to tip the DJs.

(iii)   Service Charges

The Club is not entitled to credit for that portion of fees the dancers collected and retained from the customers for booth dances and other private dances. Respondents failed to present any credible evidence that these fees became a part of Gold Club's gross receipts. *See* 29 C.F.R. § 531.55(b). Mr. Genna testified that the Club does not count the money retained by the dancers in the Club's gross receipts. To the extent that the customers sometimes paid the Club directly for these private dances by using credit cards or purchasing "funny money" obtained through the use of a credit card, those purchases were recorded as revenue of a separate corporation, NCSR, and not as revenue for the Respondents.

(e)   Unjust Enrichment

Respondents assert in the alternative that if the Lease is unlawful and unenforceable, Respondents are still entitled to a judgment on the alternative counterclaim of offset based on unjust enrichment. As they point out in their brief, "'Unjust enrichment is a legal doctrine to be

-18-

applied when no remedy is available pursuant to a contract.'" *Russell v. Russell*, 91 Conn. App. 619, 637, 882 A.2d 98 (2005) (citation omitted). "Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff. The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment." *Gagne v. Vaccaro*, 255 Conn. 390, 409, 766 A.2d 416 (2001). "Unjust enrichment applies when justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." *Bolmer v. Kocet*, 6 Conn. App. 595, 612, 507 A.2d 129 (1986) (internal quotation marks and citation omitted).

There is nothing unjust under the circumstances of this case in the Claimants retaining what they were previously paid for the dances and, in addition, receiving minimum wages for the relevant periods. First, the Claimants never worked at the Club for minimum wages, nor have Respondents presented any proof that any dancer who ever worked at the Club during the relevant time period (2007 – 2010) was paid a minimum wage. In short, there was no evidence that the market rate for dancers working at The Gold Club was the minimum wage. Accordingly, allowing Claimants to receive a minimum wage, which they would be entitled to if they had been properly classified, in addition to retaining the fees they earned from the private dances, would not constitute excessive compensation.

Moreover, by misclassifying Claimants as tenants or lessees rather than employees and insisting on contractual terms that would deprive them of various employee benefits (*see*

-19-

Paragraph 12B), Respondents denied Claimants the protections provided by law and put them at risk of suffering various harms for which they would not receive compensation.

As the Administrator of the Wage and Hour Division of the U.S. Department of Labor aptly noted in 2007, misclassified employees may suffer a variety of harms.

> There may also be other issues that are outside the scope of Wage and Hour Jurisdiction, such as contributions to benefit plans, tax payments, you know, employment insurance payments, unemployment insurance payments, workers' comp. These may be harms that a worker would suffer if the worker is misdesignated under the statutes, under IRS statutes, under state or other insurance programs.

*See, The Misclassification of Workers as Independent Contractors: What Policies and Practices Best Protect Workers?: Joint Hearing Before the Subcomm. on Health, Employment, Labor and Pensions and the Subcomm. on Workforce Protections of the H. Comm. on Education and Labor,* 110th Cong. 9-35 (2007) (statement of Paul DeCamp, Administrator of the Wage & Hour Division, U.S. Department of Labor) at pp. 9, 10, 12, 23.

In short, calling workers lessees or tenants when they are, in reality, employees costs those workers protections provided by laws and loss of benefits, costs taxpayers revenue and costs honest businesses a fair opportunity to compete for work.

In view of all of these considerations, the Arbitrator finds that allowing the Claimants to receive minimum wages and retain their portion of the dance fees they earned here is not unjust. Accordingly, the Respondents are not entitled to a set-off based under the equitable doctrine of unjust enrichment.

(f)     Liquidated Damages

Under both Connecticut and federal law, employees are entitled to liquidated (double) damages for wage violations. Conn. Gen. Stat. § 31-72 ("When any employer fails to pay an employee wages in accordance with [the wage laws]..., such employee or labor organization may recover, in a civil action, twice the full amount of such wages..."); 29 U.S.C. § 216(b) ("Any

-20-

employer who violates the provisions of [section 206 or section 207 of this title] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.").

A court may refuse to award liquidated damages under the FLSA if the employer can show to the Court's satisfaction that his failure to pay the wages in dispute was the result of his good faith belief that he was not obligated to do so and that he had reasonable grounds for believing that his failure to pay the wages was not a violation of the FLSA. "To establish 'good faith' a defendant must produce 'plain and substantial evidence of at least an honest intention to ascertain what the Act required and to comply with it.'" *Reich v. Southern New England Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1977) (citation omitted). Respondents have failed to show that they acted in good faith.

As the Court pointed out in *Reich,*

"Good faith" . . . requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them. . . . Nor is good faith demonstrated by the absence of complaints on the part of employees, . . .or simple conformity with industry-wide practice. *Id.* (citations omitted).

The employer must prove both subjective good faith and objective reasonableness. *Id.* Simply put, proof of a pure heart and an empty head is not enough.

Moreover, as one court noted, failure to request an opinion from the Department of Labor defeated the employer's good faith defense to liquidated damages under the FLSA. *Renfro v. City of Emporia*, 948 F.2d 1529, 1541 (10th Cir. 1991). Here, Paul Genna was involved in the decision to classify the dancers as tenants or lessees and he decided to use the Entertainment Lease. He admitted at the hearing that he did not consult any government agency for advice

-21-

about how the dancers should be classified, nor did he say he visited the Department of Labor website, where there is much useful information and guidance. As the Administrator of the Wage and Hour Division of the United States Department of Labor testified:

> We also make available to workers and employers a significant amount of information regarding the issue of employee versus independent contractor. On our Web site, we have fact sheets that explain the applicable rules. Much of this information is available in Spanish, Chinese, Thai, and Vietnamese.
>
> We also have an interactive advisor on our Web site that allows a user to answer some questions and then receive guidance regarding how a worker should be classified. Our Web site also includes a chapter from our field operations handbook regarding, among other things, the employment relationship.
>
> In addition, the agency conducts approximately 2,000 training and outreach events each year. When we address workers or businesses in industries where misdesignation as independent contractors is a significant concern, we provide information on that issue.

See Statement of Paul DeCamp, supra, at p. 11.

Respondents have failed to prove they acted in good faith and had reasonable grounds for believing that their failure to pay wages was not a violation of FLSA. Therefore, I find that Claimants are entitled to an award of double or liquidated damages under the FLSA.

(g)    Statute of Limitations – Willfulness

The statute of limitations for claims under the Connecticut wage laws is two years. Under federal law, the statute of limitations for an FLSA claim is two years, unless the violation is willful. In the event of a willful violation, FLSA allows three years. See Kuebel v. Black & Decker, Inc., 643 F.3d 352, 366 (2d Cir. 2011) (citing 29 U.S.C. § 255(a)). Here, the federal complaint was filed on January 6, 2011. Accordingly, if a willful violation were proven, the federal claim for violation of FLSA would go back to January 6, 2008.

-22-

In *Kuebel*, the Second Circuit stated that "'[a]n employer willfully violates the FLSA when it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the Act.'" *Id.* (citations omitted). During the second day of the hearing, Mr. Genna testified that he decided to use the Entertainment Lease that he had borrowed from a former Gold Club manager. Before deciding to use the Lease, he did not consult any government agencies for advice about how the dancers should be classified. He did attend seminars in Las Vegas but did not conduct any other research to determine how dancers should be classified. Likewise, he did not conduct any legal research to determine how courts decided the classification issue. In his testimony at the hearing, he did refer to "industry standards" but provided little explanation of what he was talking about. Mr. Gemma did speak with attorneys, including Attorney Dan Silver, his own attorney. However he provided no information about what they may have discussed regarding the requirements of law or the classification issue. Moreover, at the hearing, counsel for the Club has made it clear that Respondents are not relying on a defense of "advice of counsel." Rather, they are simply indicating that Mr. Genna did speak with attorneys before deciding to use the Lease at his Club. Additionally, at the hearing Mr. Genna admitted that he understood that, in Connecticut, workers have a lawful right to make a claim that they are employees. He also admitted that the only reason the Gold Club filed counterclaims against Vilnit and D'Antuono was because they claimed they were employees.

In *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1062 (2d Cir. 1988), the court stated that "[f]ailure to obtain a ruling [from a government agency], even when one has not been suggested, has resulted in the determination of willful violation under the reckless disregard standard") (citation omitted). I find that the conduct of Mr. Genna and his testimony establish Respondents'

43779964.5

reckless disregard for the requirements of law and, accordingly, I find the violation was willful, making the three-year statute of limitations applicable to these claims.

IV.   Conclusion

Based on my findings that the Claimants were employees of the Respondent Club throughout the years they performed there as dancers, and my findings that, as a result, Respondents violated Connecticut and federal law in misclassifying the dancers as tenants or lessees and not paying them wages required by law, and my further finding that the Respondents have not demonstrated that their actions were in good faith as defined by law, I award the Claimants their compensatory and liquidated damages.  I also find that the violations were willful, as defined by the case law under the Fair Labor Standards Act, and therefore find that the three-year statute of limitations under the FLSA is applicable.

A.   Damages

I award damages to the Claimants as follows:  D'Antuono is awarded FIFTY-EIGHT THOUSAND SEVEN HUNDRED FIFTY-SIX AND 80/100 ($58,756.80) DOLLARS, and Vilnit is awarded SIXTY-NINE THOUSAND SEVEN HUNDRED THIRTY EIGHT AND 00/100 ($69,738.00) DOLLARS, as set forth, with more particularity, in Exhibit A to Claimants' Post-Hearing Submission entitled "Claimant's Proposed Findings of Fact and Rulings of Law" filed on March 28, 2013.[5]

B.   Attorneys' Fees

In addition to an award of damages as set forth above, I find that the Claimants are entitled to reasonable attorneys' fees and reasonable costs pursuant to 29 U.S.C. § 216(b) and

---

[5] In Schedule A, Claimants seek damages for the portion of private dance (entertainment fees) fees they paid over to the Club as, for example, the $5 they paid to the Club from the $25 fixed fee for a table or booth dance.  I have denied any recovery of damages for those claims.

43779964.5

Conn. Gen. Stat. § 31-72.  Claimants may submit their petitions for costs and fees, and

Respondents may submit any opposition, in accordance with the following schedule:

(1)    Claimants' Petition for Fees and Costs shall be filed by July 15, 2013;

(2)    Respondents' Opposition, if any, to fees and costs, shall be submitted by July 31, 2013;

(3)    Claimants' Reply, if any, shall be submitted by August 10, 2013.

Date: _June 17, 2013_

_____
Albert Zakarian, Arbitrator

I, Albert Zakarian, do hereby affirm upon my oath as Arbitrator, that I am the individual described in and who executed this instrument, which is my Interim Award.

Date: _June 17, 2013_

_____
Albert Zakarian, Arbitrator

-25-